PHILIP MINIS, PLAINTIFF IN ERROR, *v.* THE UNITED STATES,
DEFENDANTS IN ERROR.

Dr. Minis, a surgeon in the service of the army of the United States, was appointed
a military disbursing agent for removing and subsisting the Cherokee Indians. He
charged two and a half per cent. on the sum of five hundred and fourteen thousand
two hundred and thirty-seven dollars actually disbursed by him in the course of his
agency in 1836, 1837. The charge was rejected at the Treasury, on the authority
of a clause in the act of Congress of March 3, 1835, ch. 303. It was contended by
the plaintiff in error, 1. That this act of Congress did not apply to the case. 2. That
from the long established practice of the government, as well as from the established
law of the land, he was entitled to commissions; there being no law prior to 1839
disallowing commissions on moneys disbursed for the government. 3. That the
charge of commissions should be allowed, because the charge is made on disbursements
of moneys appropriated during the session of Congress of 1836, 1837, and therefore
neither the act of 1835, or 1839 were applicable to the claim. Held, that the claim
is not supported by the laws of the United States; and that no commissions are
chargeable to the United States on the moneys disbursed by the agent of the United
States for removing and subsisting the Cherokee Indians. The case falls directly
within the act of 30th June, 1834, ch. 162, for organizing the Indian Department.
This act authorizes the President of the United States to require any military officer
of the United States to execute the duties of Indian agent; and prohibits any other
compensation for their services, other than an allowance for actual travelling
expenses.

In the act of Congress of 3d March, 1835, ch. 303, entitled an act making certain
additional appropriations for the Delaware Breakwater, &c., a proviso is introduced,
"Provided that no officer of the army shall receive any per cent. or additional pay,
extra allowance or compensation, in any form whatsoever, on account of disbursing
any public money appropriated by law, during the present session, for fortifications,
&c., or for any other service or duty whatsoever, unless authorized by law." Held,
that this proviso applied only to the appropriations made for military purposes by that
act, and to any which might be made during that session of Congress; and was not
a general permanent regulation, applicable to all cases of expenditures for the military
purposes of the United States, under the provisions of acts of Congress. It would
be somewhat novel to find engrafted upon an act making special and temporary
appropriations, any proviso which was to have a general and permanent application
to all future appropriations. Nor ought such an intention on the part of the legis-
lature to be presumed, unless it is expressed in the most clear and positive terms,
and where the language admits of no other reasonable interpretation.

The office of a proviso, generally, is either to except something from the enacting
clause, or to qualify or restrain its generality, or to exclude some possible ground of
misinterpretation of its extending to cases not intended by the legislature to be brought
within its purview.

[Minis *v.* The United States.]

The money appropriated to the payment of the Cherokee Indians, upon their removal, and the cession of their land, was properly public money ; and the disbursements thereof were on account of the United States, and for their benefit, in fulfilment of the obligations of the treaty.

IN error to the Circuit Court of the United States for the District of Georgia.

The United States, at August term, 1838, presented a petition to the District Judge of the District Court of the District of Georgia, stating that Philip Minis was indebted to the United States in the sum of thirteen thousand five hundred and eighty-nine dollars and five cents, exclusive of interest, for money lent, money paid by the United States for the use of the defendant, and for money had and received, and found due by him to the United States.

The claim of the United States was on a Treasury transcript, duly certified, of the account of the United States with the defendant, Philip Minis, surgeon and military district agent, dated January 15th, 1838, showing the amount claimed to be due by him to the United States.

Against this demand, the defendant claimed certain allowances which had been submitted to the Treasury, among which was a charge of two and a half per cent. commissions for disbursing five hundred and fourteen thousand two hundred and thirty-seven dollars and sixty-one cents, the same sum having been paid by him as the agent of the United States for removing and subsisting the Cherokee Indians. This was disallowed at the Treasury of the United States, under the act of 3d of March, 1835, which prohibits the allowance of any per cent. or additional pay in any form, on account of disbursing any public money, unless authorized by law.

On the trial of the cause, the counsel for the defendant prayed the Court to give the following instructions to the jury.

1st. That the clause in the act of Congress of the 3d March, 1835, and which is relied upon as the authority by which the defendant's claim for commissions was rejected, does not apply to defendant's case; because it expressly refers to moneys appropriated during that session of Congress, and, therefore, the Second Auditor erred in disallowing the charge for commissions.

2d. That Dr. Minis was entitled to the commissions charged by him, as well from the long established practice of the government, as from the law of the land; there being no law prior to the 3d March, 1839, disallowing commissions on moneys disbursed for the government.

3d. That the charge for commissions should be allowed because the charge is made for the disbursement of moneys appropriated during the session of 1836 and 1837, and, therefore, neither the act of 1835 nor of 1839, is applicable.

4th. That the amount of West's account should have been allowed as a credit to Dr. Minis, because the same was paid in good faith by him; and that the United States should not discredit the act of their own agent.

5th. That as Dr. Minis's duty was to pay money upon the requisitions of the Superintendent and Commissioners, he was fully authorized to pay West's account to any one who had possession of the account thus passed and certified to by the Superintendent; and that this case was still stronger, because John W. West was the acknowledged attorney of Jacob West, and had before received money from Doctor Minis as disbursing agent. Which instructions the Court refused to give, but instructed the jury, "that in the relation which the defendant had stood to the United States as an officer in the army, he had no claim by law for commissions on the sum disbursed by him, whatever interpretation might be given to the concluding proviso of the act of the 3d March, 1835; and admitting that such proviso was limited to a prohibition of per cent. additional pay, extra allowance or compensation, on account of disbursing any public money appropriated by law during the session of Congress when the act was passed containing the proviso, that said proviso could not be interpreted to give commissions or per cent. upon disbursements of antecedent or subsequent appropriations of money by Congress, unless the same were authorized by law; and that no law authorized the defendant to charge commissions; and, therefore, that the Second Auditor had not erred in disallowing commissions to the defendant."

The defendant excepted to the opinion of the Court; and a verdict and judgment having been rendered for the United States, the defendant prosecuted this writ of error.

[Minis *v.* The United States.]

The case was presented by Mr. Coxe and Mr. Jones, for the plaintiff in error, on a written argument; and was argued at the bar by Mr. Gilpin, Attorney General, for the United States.

Mr. Coxe, and Mr. Jones, for the plaintiff in error.

This action was originally instituted in the District Court, where issue was joined; and in August, 1839, on the application of the Attorney for the United States, it was suggested that the District Judge, having been of counsel for defendant, it was ordered that such fact be entered on the records of the Court, and that an authenticated copy of the same, with all the proceedings in the action, be certified to the Circuit Court.

Whether this was done, does not appear; or whether there was any action, or order in the Circuit Court assuming jurisdiction; but the next proceeding is in the Circuit Court, viz.: the swearing of the jury.

The account filed with the declaration exhibits the items in controversy. Among the items, is one for commissions of two and a half per cent., for disbursing the sum of five hundred and fourteen thousand two hundred and thirty-seven dollars and sixty-four cents, which was claimed by the plaintiff in error, and disallowed by the Auditor, under a construction given by him, to the act of 3d March, 1835.

The record is very imperfectly prepared. It is, however, understood, that the Treasury account was the only evidence given by the plaintiffs, in the Circuit Court, and that the real question in contest, was the propriety of the claim for the commissions charged.

The Auditor places his rejection of the claim upon the single ground that the act of 1836 prohibits such allowance.

The learned judge who tried the case puts it on the more general ground, that, whatever interpretation might be given to that act, yet it was clear that it could not be construed to give commissions, &c., upon disbursements, and that there was no law authorizing the defendant to charge commissions; and, therefore, that the Auditor had not erred in disallowing them.

The conclusion, therefore, to which the Court arrived was, that the judgment of the Auditor was right.

The facts of the case are very imperfectly stated in the record;

but the learned judge who tried the case, and the Attorney General, will be able to correct any error in the statement, which, in general, will be found corroborated by the record.

The plaintiff in error, was a surgeon in the army of the United States, and as such was directed to aid in the removing of the Cherokee Indians, from their country to the new country assigned them beyond the Mississippi. While thus engaged, he was called upon, by the government, to disburse in the years 1836, and 1837, large sums of money in fulfilling the stipulations of the treaty of New Echota, of the 29th of December, 1835. This duty he faithfully performed, from the 15th of October, 1836, till the 25th of July, 1837. These facts appear from the government accounts. The same accounts show that the amount was five hundred and fourteen thousand three hundred and seventeen dollars and sixty-one cents, less the balance of fifteen thousand five hundred and thirty-six dollars and eighteen cents, say four hundred and ninety-eight thousand seven hundred and eighty-one dollars and forty-three cents.

It is obvious, that this duty was foreign to his duty as surgeon in the army, and if any question of fact be raised upon the evidence as exhibited on the record, it may be remarked that all the facts upon which the allowance is claimed are clearly set forth, while the fact of his being a surgeon is only matter of inference. That he disbursed the money is shown; that he was at the time, an officer in the service of the government, is not distinctly apparent anywhere; although it would be conceded that such was the case, provided the government will, on its part, concede the other facts which constitute the foundation of the claim, and the truth of which may be verified by the public records.

Upon this state of the law, these questions arise:

1. Whether the acts of Congress of the 3d of March, 1835, applies to this case, and forbids the allowance?

2. Whether, independent of that statute, such a claim can be allowed?

I. The proviso attached to the act of March 3d, 1835, c. 303, (9 Laws of United States, 207, 208,) declared that "no officer of the army shall receive any per cent., extra allowance, or compensation, in any form whatever, or account of the disburs-

ing any public money appropriated by law, during the present session," &c.

1. It may be remarked in regard to this act, that the money disbursed by Dr. Minis, cannot, with propriety, be termed public money. It did not belong to the United States, nor was the service one rendered to the government. It was part of the fund stipulated by treaty to be paid to the Cherokee Indians, for the cession of their territory by the treaty of 1835. The disbursement was made on account of the Cherokees, and with all other expenses attending the removal of the Indians, was to be charged to that fund. It is, therefore, analogous to a case in which a public officer has rendered a service to a third party, not necessarily connected with his public duty, as salvage by an officer of the government; can the payment for this service be rejected because of the office the individual held? See the case of the Tigre, decided by Judge Washington. Wash. C. C. R. 2.

2. This proviso was well considered, in the case of The United States v. Gratiot. The terms of the act, by their own force, are limited to appropriations made during the then session of Congress.

II. Whether upon general principles, independent of the act of 1835, can such allowance be made?

This question may also be regarded as comprehended in the argument of Gratiot's case. There are, however, some points of distinction.

In that case, it was urged on behalf of the government, that the services for which compensation was asked, were not extra but strictly within the line of official duty. Upon this ground, the various cases in which compensation was made for services rendered in relation to Indian matters, were distinguished from the case at bar. The allowances to General Scott, Governor Cass, Colonel Abert, were vindicated upon this ground.

This distinction is even more clear in the present case. There is not the remotest resemblance between the professional duties of a surgeon, and those of disbursing military agent. They are wholly foreign to each other. The accounts in this case describe the defendant as surgeon, but the account is against him as military disbursing agent, and the items of claim are for

[Minis *v.* The United States.]

money placed in his hands, in this capacity. In fact, his accounts as an officer in the army are properly settled in the Third Auditor's Office; the disbursements on Indian accounts, in another department of the Treasury. The nature and character of the duties then, are wholly distinct; the funds out of which payment is made, are equally so; and the accounts are settled in different departments, and by different officers of the Treasury: no case can be more clearly, one of extra official duty, or performance.

In cases where the distinction was far less obvious, the usage of the government to pay a quantum meruit for extra services, has been fully recognised. A reference is made to the cases of Fillebrown, M'Daniel, and Ripley, in 7 Peters. This usage having been judicially established, need not be again proved by evidence, but will be judicially recognised and acted upon. 7 Cranch, 506. 9 Wheat. 581. 1 Peters' C. C. R. 225.

The act of June 30, 1834, c. 162, (9 Laws United States, 137, &c.,) has been cited by the Attorney General. A reference to this act will show that it had no other agents in view than those designated by the act as Indian agents, and that neither the 4th, the 10th, nor the 13th sections have any application to the case at bar.

As to the peculiar hardship of this case, it is unnecessary to speak. The disbursements were made in the Indian country, and while attending the Cherokees across the Mississippi. No places of deposit existed; no military escort was furnished; payments made in small sums; and the party compelled to preserve them all at his own risk, the responsibility was heavy, and the duties onerous in the extreme. They have been faithfully performed, and the compensation asked would still leave the claimant a loser by the operation.

Mr. Gilpin, for the United States.

This was an action of assumpsit instituted in the Circuit Court of Georgia, by the United States, against Philip Minis, to recover thirteen thousand five hundred and eighty-nine dollars, and five cents. The defendant pleaded the general issue, and, at the trial of the cause, produced Captain John Mackay, of the United States army, as a witness, who gave evidence that he had been

in the Cherokee country about the same time with the defendant; that he had been allowed for fuel and quarters, and that such charges were usual; and that it was also usual to allow officers, whose accounts were large, their travelling expenses in going to Washington to settle them. The record then proceeds to say: "Whereupon the said counsel for the defendant did then and there pray the judge of the said Court to give the following instructions to the jury." The instructions asked are then set forth, and, in substance, declare, that the defendant is not debarred of his claim to commissions on disbursements which he made, by reason of the proviso of the act of 3d March, 1835, the same not being applicable to his case; that he is entitled to them from long established practice of the government, there being no law before 3d of March, 1839, disallowing them.

The Court refused to give these instructions, but did instruct the jury, in effect, that the defendant, being an officer of the army, had no claim by law to such commissions, whatever might be the construction of the proviso of the act of 1835, because the same were not authorized by any law. To these instructions the defendant excepted, and the jury found a verdict for the plaintiffs, for eleven thousand four hundred and sixty-one dollars, and fifty-six cents, and judgment was entered therefor. Annexed to the record is a Treasury transcript of the account between the plaintiffs and defendant. It is not referred to in the record, nor is it stated to have been given in evidence. It appears to have been filed with the declaration or plea.

Will this Court, upon this record, reverse this judgment? If there is ground so to do, it must be in the charge of the Court on the points excepted to.

1. To this it is answered, in the first place, that the bill of exceptions is totally defective in not presenting a statement of the evidence to which the charge of the judge referred. A bill of exceptions is a privilege by which a party subjects the opinions of the judge to re-examination at his own pleasure; it is necessary, therefore, that all which relates to, or bears upon that opinion should be carefully set forth. Without that the Court which revises has not the same case before them. It cannot tell whether the instruction given or refused, or the decision made, was warranted or not. This rule, so apparent to common

.sense and justice, is abundantly fortified by judicial decisions. Buller's N. P. 317. 2 Tidd's Practice, 912. Brownl. 129. 1 Lutw. 905. 1 Salk. 284. 3 Durn, and East, 27. Does this bill of exceptions comply with any of these requisites? Is there any thing in it which will enable this Court to say that the charge of the judge was wrong? It shows that the judge was asked to say that a certain act of Congress did not "apply to the defendant's case." What case? the money received by him; or the promise to pay, as set forth in the declaration; or the allowance for fuel and travelling expenses? These are the only points of the case which the record exhibits, yet they are manifestly not those to which the charge relates. Is it said that all this appears in the Treasury transcript, which is found among the papers before the Court? That cannot be; there is no evidence, nor even any allegation that this paper was before the jury; none that it was offered; if offered, whether rejected or received; if received, whether it stood alone, or was contradicted or corroborated; it is now before us as a paper filed among the documents relating to the case, farther than that we know nothing of it. Is it possible that we can take for granted that the charge of the Court related to this paper and no other? Are we to admit that the exception taken related to certain commissions in this transcript? To pass upon the charges and decisions of Courts in this way would leave them at the mercy of the party thus preparing his bill of exceptions. It is not contended that it is necessary to set out the whole evidence—even that relating to the instructions—at large: but it is necessary that the evidence referred to should be distinctly stated, so far as it bears upon them.

2. This objection is the more fatal in this instance, because the sufficiency of the defence, even had the instruction been given as prayed for, depended upon evidence of the defendant having complied with the requisitions of the act of Congress by presenting his claim or offset at the Treasury, and its having been there allowed or disallowed. This fact must appear before it can be said whether the charge of the Court was incorrect or not; yet it does not appear; it is not stated in the bill of exceptions; if we suppose the Treasury transcript to be part of the bill of exceptions, it then even does not very clearly appear; but

if that document be not a part of it, then there is nothing whatever to show that the defendant had a right to ask from the Court the instructions that he did. In no case whatever in which this Court has passed upon the legality of a claim of an officer to credits as a set-off, has he failed to make it appear by the record that the claim had been duly presented and disallowed. "Had the claim," say this Court in the case of The United States *v.* M'Daniel, 7 Peters, 11, "never. been presented to the department for allowance, it would not have been admitted as evidence by the Court:" and in the case of The United States *v.* Fillebrown, 7. Peters, 48, they say "the claim must have been presented to the proper officers and disallowed." The defendant prays the Court to charge that he is not to be debarred by an act of Congress from certain commissions, and the Court refused to do so; he must show by evidence, or state distinctly in his bill of exceptions, what the commissions were; and he must show or state, in the same manner, that he had complied with the law which authorized their allowance. Not having done this, the refusal of the Court to give the instructions cannot be treated as an error.

3. But the bill of exceptions is still more defective in another point. It excepts to the judge not having charged the jury that the defendant was entitled to certain commissions, on the ground of "long established practice of the government;" and yet neither the bill of exceptions, nor any part of the record, contains any evidence of such practice; or any averment that such evidence was offered to the jury; or any assertion that such a practice, in the case of a public officer such as the defendant was, ever did exist. Evidence of a usage is indeed given, and is set out in the bill of exceptions; but it is usage to allow fuel, quarters, and travelling expenses, not commissions on disbursements. Even the Treasury transcript, if a part of the record, throws no light upon this point: How then can this Court say that the Court below erred in refusing to charge the jury that a certain claim to commissions was authorized by "long established practice," when it does not appear that one particle of evidence of such practice was offered? The prayer is not to instruct the jury that "if they believed such practice existed they should allow the claim;" but it is to instruct the jury that "the defend-

ant was entitled to it from long established practice." There have been numerous cases where this Court has been called on to review the decisions of Courts below in allowing or rejecting evidence of usage, and their opinions on the weight to be given to usages that have been proved; but in every such case it has been made to appear to this Court that proof of the usage was submitted. Unless a usage be so certain, uniform, and notorious as to be understood and known by both parties, it cannot enter into their contract, even where not forbidden by law; and therefore in every case of extra allowance that has been brought before this Court, it has appeared that evidence of its being so, was offered in the trial below. The total omission of all such evidence in this bill of exceptions, and the want of any averment on the subject, preclude this Court from saying that the judge erred in refusing to give the charge prayed for.

On these grounds it is submitted that the judgment ought not to be reversed. The bill of exceptions is totally defective, not in form merely, but in substance. To say that the Court erred, upon such a statement of its proceedings, would be to pass a judgment, not upon what we have before us, but upon what the imagination of counsel can extract by their own interpretation of this record. That the commissions referred to in the bill of exceptions, may be the commissions stated in the Treasury transcript annexed to the papers, and that the "long established practice" may be a practice to allow surgeons two and a half per cent. commission on disbursements made by them under special orders of the War Department, cannot be denied; but this possibility is not sufficient. They may as well relate to other commissions and to other usages; and we cannot assume that they are exactly those which it is necessary they should be, to sustain the defendant's argument against this judgment.

4. Passing, however, from this defect in the record, and admitting, for the sake of argument, that it appears clearly, by the bill of exceptions, that the defendant below, who was an officer in the army, did disburse a considerable sum of money, as a disbursing agent, by the authority, and under the orders of the War Department, in the year 1836, the question remains, is he entitled to an allowance of two and a half per cent., in addition to his pay, as a compensation for so doing? The Court below have

decided that he is not so entitled by the laws of the land; and the correctness of that decision we are now to examine.

The defendant below was a surgeon in the army, and, on the 16th of October, 1836, was detailed to act as an agent for the removal of the Cherokees, under the act of 2d July, 1836, (9 Laws of United States, 453,) with an allowance, in addition to his pay, of five dollars a day, for such travelling expenses as he might incur. The duty to which he was thus assigned, was one which the Secretary of War was authorized to assign him. On the establishment of the War Department, as long since as 1789, all duties connected with Indian affairs, were specially referred, subject to the directions of the President, to the Secretary of War. Since then they have always remained under his charge. In 1830, by the act of 28th of May, (4 Story's Laws, 2204,) the system of removing the Indians beyond the Mississippi was introduced, and the President was authorized to furnish aid and assistance to the emigrating Indians. On the 9th of July, 1832, (4 Story's Laws, 2305,) on the reorganization of the Office of Indian Affairs, it was again expressly provided that the management of all matters arising out of Indian relations should be under the direction of the Secretary of War. On the 30th of June, 1834, a further act (4 Story's Laws, 2401) was passed relative to Indian relations. In that act, the Indian agents were expressly charged with the duties of managing and superintending the intercourse with the Indians; and they were directed to obey the instructions given to them by the Secretary of War, the Commissioner of Indian Affairs, or the Superintendent of Indian Affairs, and to carry into effect such regulations as might be prescribed by the President. The same act provided that it should be competent for the President to require any military officer of the United States to execute the duties of an Indian agent; and it then went on to declare that the duties required by any section of the act, from military officers, should be performed without any other compensation than their actual travelling expenses. On the 29th of December, 1835, the final treaty of removal, was made by the Cherokees, (9 Laws of United States, 1351,) which provided that, until their removal, (which was to be in two years,) they were to receive from the United States provision and clothing, and that they were then to be

[Minis *v.* The United States.]

removed to their new homes, and subsisted there for one year. On the 1st of March, 1836, a supplementary treaty was made, (9 Laws of United States, 1356,) by the third article of which it was agreed that the sum of six hundred thousand dollars should be applied by the United States, for the expenses of removal, and distributed as the treaty provided. On the 3d of March, 1836, the general appropriation bill, (9 Laws of United States, 453,) for the expenses of the Indian intercourse, was passed; which contained a clause appropriating "for the removal of the Cherokees and for spoliations, according to the third article of the supplementary treaty of 1st March, 1836, six hundred thousand dollars." On the 16th of October, 1836, the defendant, an officer of the army, was charged with performing this duty; and was engaged in it, from the 16th of October, 1836, to the 25th of July, 1837, a period of two hundred and eighty-five days. He received his pay as an officer for the same period, and, in addition, an allowance of five dollars per diem, for travelling expenses, throughout the entire period. That the duty in question was clearly one which the defendant was bound to perform, as an officer in the army, seems too clear to admit of question; that for performing the duty he, was limited to the compensation he received, seems also to be established by the laws already referred to. He was a military officer, charged with special and temporary duties, as an Indian agent, which were, in all probability, among the very acts which the law of 1834 was intended to embrace, as those to be confided by the President to army officers. If, therefore, we were to go no further, we might confidently assert that the decision of the Court below, in declaring that "the defendant, as an officer of the army, had no claim, by law, for commissions on the sum disbursed by him," is clearly warranted by the letter and intention of the acts of Congress, which apply directly to his case.

But these are not the only laws which preclude the claim of the defendant. He is an officer of the army, and, as such, he is debarred from charging commissions on the moneys disbursed. The settled policy of the law has been to prevent officers of the army from receiving commissions, and to give them a regular sum for disbursing the public funds. By the act of the 24th of April, 1816, (3 Story's Laws, 1575,) the President was author-

-ized to employ subaltern officers of the regular army, as pay-masters, but their compensation was limited expressly to the pay and emoluments of a major. So, by the act of the 2d of March, 1821, (3 Story's Laws, 1810,) the assistant commissaries, by whom large disbursements for purchases were to be made, are to be taken from the subalterns of the line, and their compensation is merely to be an addition, while so employed, of twenty dollars per month, to their pay in the line. So, by the same act, (3 Story's Laws, 1810,) the assistant quartermasters, who are charged with immense disbursements, are officers taken from the line, and receive as their compensation, a monthly addition of twenty dollars to their pay. And all these officers, thus charged with vast and most responsible duties, additional entire-ly to the regular duties of officers, are obliged to give bonds in considerable sums. These laws, which embrace all the duties as disbursing officers that could be delegated to these great divi-sions of the military service, and extend to several millions of dollars a year, thus contemplate, as will be seen, the employment of officers taken from their immediate service in the line. So far from allowing them commissions, they confine their compensa-tion to their pay, and a small additional allowance, less consi-derably than that which was received by the defendant in this instance. The assignment of Indian duties has arisen under the peculiar circumstances of the removal of the Indians within the last few years; but disbursements for it differ in no respect from those of the Quartermasters' department; they are, in fact, a branch of the duties of that department. To suppose, then, that an officer taken from the army to disburse provisions and money, and to superintend the transportation of Indians, is to receive his regular pay, and one hundred and fifty dollars a month, and then to receive besides, twelve thousand dollars for nine months, in the shape of commissions, while the same officer, if he had been assigned to disburse provisions and money, and to superin-tend the transportation of troops, would receive his regular pay, and twenty dollars a month, and nothing more, presents an in-consistency so glaring, as to set at defiance all justice or regulari-ty in the provisions of the laws.

We are not left, however, to apply to officers, employed as the defendant was, the general principle merely derived from these

enactments. We have two express provisions on the subject in the shape of authentic army regulations, promulgated before the account of the defendant was rendered. The army regulation of the 14th of March, 1835, published as a general order by the Secretary of War, declares in express terms, that "an allowance of all extra compensation of every kind whatsoever, is pro-hibited, for which provision is not made by law;" and it enu-merates, in terms, "Per centage to officers, for disbursing funds not properly appertaining to their department:" and also "com-pensation to officers on duty, connected with the removal of the Indians, except their actual travelling expenses, which are al-lowed by the act of 30th June, 1834." And the volume of Army Regulations of 1835, is still more explicit; for it provides for the identical case, by its fifty-sixth article, which is in these words: "In all cases where an officer of the army is required, by the direction of the War Department, to perform duties, or to make disbursements, for which compensation is not specially provided by law, and where the instructions directing such duties to be done, or such disbursements to be made, make no provi-sion for any additional compensation, no allowance therefor will be made to such officer. It will then be considered that, in the opinion of the War Department, the services so required are within the proper sphere of his duty, as an officer of the army." It will thus be seen that, in addition to express prohibition of the defendant's claim, as arising out of services performed by him, connected with the Indian Department, he is equally and fully prohibited from receiving it as an officer of the army, for any disbursement he might make as such. On the law of the land, then, as expressed in its statutes, the charge of the Court below was right.

It has been attempted to escape from the force of these pro-hibitions, by appealing to decisions of this Court which are sup-posed to sanction this claim for commissions, on the ground of its being an equitable allowance for extra services. A brief ex-amination of these cases will show that the defendant can derive as little aid from them in this attempt to overthrow the decision of the Circuit Court, as he can from the statute book.

The first of these cases is that of the United States v. M'Daniel, 7 Peters, 12. The defendant, who was a clerk in the

2 o 2

Navy Department, was directed, in addition to his duties as such, to perform those of a special agent, at the navy yard in Washington, where, by law, certain disbursements were to be made, but which, under the construction given to the acts of Congress, there was no agent to perform. The Secretary of the Navy allowed him a commission of one per cent., being that allowed to other agents similarly employed. This was done as early as 1817; the allowance was sanctioned by successive secretaries, and was annually reported to Congress. In 1829, the Secretary discontinued the agency, and refused to allow the commissions then due and unpaid, according to the previous practice. This Court allowed the commissions on the ground that they had been allowed by the head of an executive department, under a construction of a law evidenced by long usage, and that such allowance was not beyond the power vested in him by law. In the case of The United States v. Ripley, 7 Peters, 26, the defendant claimed to be allowed commissions for disbursements and services, which he stated to be out of the regular line of his duty, as a Major General; but this Court refused to sanction them, on the grounds, that they had not been shown by him to be out of the range of his official duty, or to have been performed with the sanction of the head of the department, or under any peculiar emergency, or to be warranted by any usage. In the case of The United States v. Fillebrown, 7 Peters, 44, the defendant was regularly appointed the Secretary of the Navy Hospital Fund, at a salary of two hundred and fifty dollars; some time after he had executed the duties of this office, the accumulation of moneys in the fund led to the commencement of large expenditures for the erection of hospitals, and the board directed the defendant to attend to the collections and disbursements, but not as a duty belonging to him as Secretary; with the understanding that he was to receive compensation, according to the usage of the government in similar cases, which was considered to be a per centage on the money disbursed. This Court allowed these commissions, on the ground that these disbursements were extra services, which the board were authorized to have performed on the usual compensation, and which were not included in the regular duties of the defendant; and that it was the settled usage, to allow a commission for their performance.

These are the only cases in which this Court has recognised the claim of an officer, receiving a fixed compensation, to charge commissions on moneys disbursed by him, where he is not, in terms, authorized by law to do so. What are the principles that they lay down? They are these: that where a person, in the public service, is required by the head of an executive department to disburse moneys which the law requires to be disbursed, but for which no person is designated, he may receive, unless prohibited by law or notice, such commissions as the head of the department shall agree upon, on such as have been sanctioned by an established usage.

Do the principles thus laid down apply in any one respect to the present case? They do not. The defendant, being an officer in the public service, was required to disburse moneys and provisions, under the specific provisions of an Indian treaty, to or for the use of the emigrating Cherokees; that this is a duty of an Indian agent, under the directions of the War Department, is too clear to admit of question. The act of 1834, then says, that all officers of the army may be required to perform any duties appertaining to an Indian agency; and it expressly directs that, where these duties are the distribution of money or provisions, an officer of the army shall be present, even though another agent is specially charged with them. These, then, are disbursements of moneys which he may by law be called on to perform; and they are thus withdrawn at once from the class to which the opinions of this Court refer. But again; such a payment for them is expressly prohibited, both by law and by previous notice; the law of 1834 says, that an officer of the army shall receive no compensation in addition to his regular pay, except his travelling expenses; and this the defendant claimed and received, to the extent of a very liberal allowance of five dollars for every day of his agency: the army regulations, too, of 1835, which are issued under the authority of an act of Congress, and, when so issued, become law, expressly prohibit the charge; the general order of the Secretary of War, of March, 1835, publicly issued, more than eighteen months before his appointment, gave him notice that no such allowance could be admitted. Thus, suppose the services were not such as he was required by law to perform, still he could not receive any such compensation as he asks, because it is pro-

hibited by law and previous notice. But, again; if such were not the case, he has still failed to make out his right in other particulars equally necessary to bring it within the rules of this Court; it was neither allowed by the head of the executive department who employed him, nor was any usage proved, or attempted to be proved in its favour; on the contrary, we have seen that the head of the War Department, by published orders in March, 1835, and in December, 1836, explicitly refused in advance to sanction such a claim; the only usage attempted by the defendant is one for an allowance of fuel and quarters, and certain travelling expenses; and the whole system in regard to allowances to officers taken from the service to perform such duties, either in the pay, commissariat, or quartermaster's departments, is shown to be exactly the reverse of what the defendant claims; and exactly in accordance with what he is allowed; that is a sum to cover his additional expenses, added to his pay.

Thus fails the endeavour to sustain this claim on principles derived from the judicial decisions of this Court. It is as little sustained by them as by positive law.

5. If the defendant could, however, have derived colour from any general laws; or if he could have brought his case within the principles established by this Court in 1833; if there had been a previous usage to make such allowances, and if they had been sanctioned by the Secretary of War, still his present claim would not avail him. The service was performed after the passage of the act of 3d March, 1835, (9 Laws U. S. 207,) which declares that "no officer of the army shall receive any per cent. or additional pay, extra allowance or compensation, in any form whatsoever, on account of the disbursing of any public money appropriated by law during the present session, for fortifications, execution of surveys, works of internal improvement, building of arsenals, purchase of public supplies of any description, or for any other service or duty whatsoever, unless authorized by law." The duty of the defendant is not one arising under any of the specified appropriations for the session of 1835; it is embraced, if at all, by the final clause: "for any other service or duty whatsoever, unless authorized by law." It is admitted that, if this is a general provision, applicable to other years than 1835, it is a legal prohibition of the defendant's claim. We are then

to ascertain whether it is so limited. It is submitted that it is not, that it is a general provision prohibiting the receipt, by an officer of the army, of any per cent. or additional pay, extra allowance or compensation, in any form whatever, for any service or duty whatsoever, unless authorized by law. This provision should be so construed because such is the general intention of the act; and because such is the true grammatical construction of its language. The general intention of the act may be inferred from the previous legislation to which I have adverted. We have seen that successively, in 1816, 1821, 1826, and 1834, Congress had legislated on these allowances to officers of the army. They had, in succession, positively forbidden that when they were called on to perform duties in the pay department, the commissariat, as quartermaster, or in connexion with Indian agencies, they should be limited to a small addition beyond their pay. Nothing can more clearly show the intention of Congress, as to the general rule it desired to establish. It had, by law after law, up to 1834, put its veto against these allowances in each of the branches in which they were most usually claimed. In 1835, the subject of the internal improvements, to which this appropriation act immediately referred, was before them; that was another class in which it was known similar claims were made; they declared that, in the appropriations they were then making, such allowances should be forbidden; and they determined to close the subject, by a general declaration to the same effect, in regard to all officers of the army. So to do was evidently to carry out their previously expressed intention; it was perfectly consistent with it; it makes the whole legislation, in regard to officers of the army, harmonious. So, too, if we look at their subsequent legislation; we find them, in 1839, adopting a similar provision, (9 Laws U. S. 1013,) in regard to "all officers in every branch of the public service;" thus completing a system which was commenced in 1816, or, perhaps, earlier; never relinquished; and enforced successively, as cases occurred which showed a deviation from it. That the construction of the provision of 1835, therefore, as a permanent one, applicable to all officers of the army, is in accordance with the intention of Congress, will hardly be denied. On the other hand, is the limitation of it to a single year consistent with such intention? It is not, in the first

56

place, because it is at variance with these previous laws; in the second place, there is no conceivable reason why it should be limited to the year 1835; there was nothing peculiar in the duties or services of that year. Again; there is nothing in the nature of the provision that should make it temporary; if it was just in one year, it was just in another; it was as much so in 1835, as in 1834 or 1836; in fact, this class of duties was unusually large in 1835; the disbursements were very great; the labours of the officers were such as, far more than in former years, to entitle them to an allowance, if the policy of the laws justified it. There is, then, every reason to suppose that Congress intended to make a general provision; and none for believing that they intended to make a temporary one. This should have great weight with us in construing language that is doubtful.

But, examining the clause in its grammatical construction, brings us to the same result. It cannot be properly read as limited to a single year; the limitation is simply a reference to particular appropriations, which are included in the provision; a designation of them, not a qualification of the general and specific enactment. It says that no officer shall receive extra compensation, on account of disbursing any public money, appropriated during the present session, for fortifications, &c.; or any other service or duty whatsoever, unless authorized by law. The only subject to which the words, "during the present session," refer, are what is then appropriated. Are duties and services "appropriated?" We must read the sentence in one of two ways; either it is to be read, "no officer shall receive extra compensation for any other service or duty whatsoever, unless authorized by law," which is a general provision; or it is to be read, "no officer shall receive extra compensation, on account of disbursing any public money, appropriated during the present session, for any service or duty, unless authorized by law." In the first place, this presents a contradiction in terms. How can the money be "appropriated for a service or duty," and yet the service or duty not be "authorized by law?" But, again, how can it be said that an appropriation is made for "a service or duty?" these are words that relate to the performance of acts by officers, not to what is the subject-matter of an appropriation; the particular works mentioned are objects of appro-

priation; and, as the yearly provision for them is the subject of the bill, it is natural and proper that, in speaking of it, they should be so alluded to; to extend it beyond this, is to give it a construction that the words do not fairly authorize.

It is submitted, then, that the decision of the Circuit Court ought not to be reversed, because no case for reversal, on the defendant's own ground, is presented by his bill of exceptions; and, if his case were properly set forth, yet the decision of the Court is in accordance with the law, as prescribed by the statute book, and as expounded by this tribunal.

Mr. Justice STORY delivered the opinion of the Court

This is the case of a writ of error to the Circuit Court for the District of Georgia. The original suit was brought by the United States against Doctor Philip Minis, (the plaintiff in error,) to recover the balance of thirteen thousand five hundred and eighty-nine dollars and five cents, due from him to the United States. At the trial of the cause upon the general issue, a transcript of the account from the Treasury Department establishing the balance was given in evidence; and the sole question in controversy between the parties was, whether Doctor Minis was entitled to credit for certain items which had been disallowed by the Treasury Department. The principal item, and the only one now in controversy, was a claim by Doctor Minis, who was a surgeon in the army, and was appointed military disbursing agent for removing and subsisting the Cherokee Indians, of two and a half per cent. commissions on the sum of five hundred and fourteen thousand two hundred and thirty-seven dollars and sixty-one cents, actually disbursed by him in the course of his agency in 1836 and 1837. No evidence was offered on the part of Doctor Minis of any contract or of any usage of the government for the allowance of any such commission, in cases of this sort. The counsel for Doctor Minis, among other things, (not material in the present state of the case,) prayed the Court to instruct the jury, 1. That the clause in the act of Congress of the 3d of March, 1835, ch. 303, which was relied upon as the authority by which the defendant's claim for commissions was rejected, did not apply to the defendant's case; because it expressly refers to moneys appropriated during that session of Congress, and,

[Minis *v*. The United States.]

therefore, that the Second Auditor erred in disallowing the charge for commissions. 2. That the defendant was entitled to the commissions charged by him, as well from the long established practice of the government, as from the law of the land; there being no law prior to the act of the 3d of March, 1839, disallowing commissions or moneys disbursed for the government. 3. That the charge for commissions should be allowed, because the charge is made for the disbursement of moneys appropriated during the sessions of Congress of 1836 and 1837; and, therefore, that neither the act of 1835 nor of 1839 was applicable.

These instructions the Court refused to give; but instructed the jury " that in the relations which the defendant had stood to the United States, as an officer in the army, he had no claim by law for commissions on the sum disbursed by him, whatever interpretation might be given to the concluding proviso of the act of the 3d of March, 1835, ch. 303; and admitting that such proviso was limited to a prohibition per cent., additional pay, extra allowance or compensation, on account of disbursing any public money appropriated by law during the session of Congress when the act was passed containing the proviso; that said proviso could not be interpreted to give commissions or per cent. upon disbursements of antecedent or subsequent appropriations of money by Congress, unless the same were authorized by law; and that no law authorized the defendant to charge commissions; and therefore that the Second Auditor had not erred in disallowing commissions to the defendant." To this opinion of the Court the defendant excepted. The jury found a verdict for the United States, after deducting certain other disallowed items; and judgment was rendered, accordingly, for the United States; and the present writ of error is brought to revise that judgment.

It is certainly true, as has been suggested at the bar, that the case is, as to the evidence necessary to raise some of the questions very imperfectly and defectively stated; and therefore some of the instructions might on this account have been well refused. It is, however, much more satisfactory to us to be able to dispose of the case upon its true merits.

The first instruction asked embraces the question, what is the true construction of the first section of the act of the 3d of

March, 1835, ch. 303, entitled "An act making certain additional appropriations for the Delaware Breakwater, and for certain harbours, and removing obstructions in and at the mouth of certain rivers, for the year 1835." That act, after making the specific appropriations, contains the following proviso : " Provided, that no officers of the army shall receive any per cent. or additional pay, extra allowance or compensation, in any form whatsoever, on account of the disbursing any public money appropriated by law during the present session for fortifications, execution of surveys, works of internal improvement, building of arsenals, purchase of public supplies of any description, or for any other service or duty whatsoever, unless authorized by law." The argument on behalf of the United States is, that this proviso, although found in a mere appropriation law of a limited nature, is to be construed, by reason of the words " or for any other service or duty whatsoever, unless authorized by law," to be permanent in its operation, and applicable to all future appropriations, where officers of the army are employed in such service or duty; and that it appears from the record, that this was the very ground on which the Treasury Department rejected the claim of Doctor Minis for commissions. The same question has been made and fully argued in the case of Gratiot v. The United States, at the present term; and we have given it our deliberate consideration. We are of opinion that such is not the true interpretation of the terms of the proviso ; and that it is limited exclusively to appropriations made at the session of 1835.

It would be somewhat unusual to find engrafted upon an act making special and temporary appropriation, any provision which was to have a general and permanent application to all future appropriations. Nor ought such an intention on the part of the legislature to be presumed, unless it is expressed in the most clear and positive terms, and where the language admits of no other reasonable interpretation. The office of a proviso, generally, is either to except something from the enacting clause, or to qualify or restrain its generality, or to exclude some possible ground of misinterpretation of it, as extending to cases not intended by the legislature to be brought within its purview. A general rule, applicable to all future cases, would most natu-

rally be expected to find its proper place in some distinct and independent enactment.

Now, the language of the present proviso is perfectly satisfied by confining its operation to appropriations to be made during the then existing session. It seems clear that the words of the proviso ought to receive this interpretation, if the last clause, "or for any other service or duty whatsoever, unless authorized by law," were left out. The proviso would then in legal effect read : that no officer of the army shall receive any per cent. or additional pay, extra allowance, or compensation, in any form whatever, on account of the disbursing any public money appropriated by law during the present session, for fortifications, for execution of surveys, for works of internal improvement, for building of arsenals, for the purchase of public supplies of every description. What difficulty, then, is created by the addition of the subsequent clause? In our judgment none whatsoever. The preceding enumeration is of special services in disbursing public money on account of particular appropriations for fortifications, &c. But it was foreseen by Congress that other appropriations might be made during the same session for other objects not comprehended in the preceding enumeration ; and therefore, ex industria, the subsequent clause was added to supply any defect of this nature, and to cut off all claims for extra pay, allowance, or compensation for disbursements connected with such objects. The whole clause in this view would read precisely as if it had been introduced immediately after the words "for fortifications." It would then be, that no officer of the army shall receive any per cent., &c., on account of disbursing any public money appropriated by law during the present session, for fortifications, or for any other service or duty whatsoever. This, too, is the grammatical sense of the words of the whole proviso, in the order in which they stand. On the other hand, the interpretation put upon the proviso on behalf of the United States, requires the Court to read it as if the last clause were wholly independent of the preceding enumeration, and permanently prohibited any extra allowance or compensation "for any other service or duty" than disbursements, but prohibited it for disbursements only, under appropriations made during that session. This would seem obviously to be inconsistent with the policy

upon which the supposed permanency of the proviso is made to rest. The prohibition would then be utterly inapplicable to disbursements of future appropriations, which in most cases is the leading item of charge, and would be confined to "any other service or duty." Such an interpretation certainly ought not to be adopted in a proviso to an act making appropriations for certain specified objects, unless it be unavoidable. And to make the proviso apply to disbursements under future appropriations generally, the Court would be driven to interpolate into it the words " or at any future session ;" a liberty which, consistently with the known limits of judicial duty, could never be properly assumed.

The subsequent legislation of Congress, even if it could be brought in aid of the argument, rather tends to confirm, than to impugn the interpretation which we have given to the proviso. It was not until the act of 3d March, 1839, ch. 82, that Congress made a general provision on the subject, and enacted, by a distinct section, that no officer, in any branch of the public service, or any other person, whose salaries, or whose pay or emolument is, or are fixed by law, shall receive any extra allowance or compensation in any form whatever, for the disbursement of public money, or the performance of any other service, unless the said extra allowance or compensation be allowed by law. The generality of this section would seem to show that, until that period, no law existed on the subject which was permanently applicable to any branch of the public service.

We think, then, that according to the natural meaning of the words, and the order in which they stand, the true interpretation of the whole proviso is, that it is limited to appropriations made during the session of 1835. If, therefore, the disallowance of Dr. Minis's claim to commissions depended upon the act of 1835, (as was the construction of the Treasury Department,) the instruction asked on this point ought to have been given by the Circuit Court.

But we are of opinion that his claim was properly disallowed upon another and distinct ground. No evidence of any contract or usage was offered to sustain it ; and the case appears to us to fall directly within the provisions of the act of 30th of June, 1834, ch. 162, for the organization of the Department of Indian Affairs. The 4th section of that act provides that " it shall be competent

for the President to require any military officer of the United States to execute the duties of an Indian agent." The 13th section further provides, that "the duties required by any section of this act, of military officers, shall be performed without any other compensation than their actual travelling expenses." Dr. Minis being a surgeon in the army, was appointed disbursing agent for removing and subsisting the Cherokee Indians, and has been allowed a compensation for his travelling expenses, under the agency, of five dollars per diem, amounting, in the whole, to the sum of one thousand four hundred and twenty dollars. It is not pretended that this sum was not a reasonable compensation.

It has been suggested at the argument, that no other agents are within the purview of the act of 1834, than such Indian agents as are to be appointed under that act as general Indian agents; and that Dr. Minis was not in that predicament. But looking to the whole scope and object of that act, contemplating, as it does, that military officers might be called upon to perform duties in connection with the general Indian agents, by the direction of the President, we cannot but entertain the opinion, that the terms of the act were designed to exclude such military officers from any other compensation than their travelling expenses; as, in truth, when detached upon such special service, they were still entitled to their ordinary military pay and emoluments.

It has also been suggested, that the disbursements in the present case were not properly of public money, because it was money stipulated by treaty to be paid to the Cherokees, upon their removal, and the cession of their lands. But we think this objection is unmaintainable. The payments made were properly public money, and the disbursements thereof were on account of the United States, and for their use and benefit, in fulfilment of the obligations of the treaty.

Upon the whole, therefore, we are of opinion that the Circuit Court rightfully, under all the circumstances of the case, refused the instructions prayed for; and gave the very instruction which was required by law.

The judgment is, therefore, affirmed.