## ALABAMA & FLORIDA RAILROAD COMPANY *vs.* BURKETT.

[PROCEEDING TO ASSESS DAMAGES TO LAND CONDEMNED FOR RIGHT OF WAY FOR THE USE OF RAILROAD COMPANY.]

1. *Railroad company, charter of; creates a contract.*—The charter of a railroad company is a contract which is protected by clause 1, section 10, of article I. of the Constitution of the United States, unless the charter is by its terms repealable.

2. *Same ; how can not be impaired.*—A State can not impair the obligation and privileges secured by such a charter, either by its constitution or its laws. The prohibition is on the State by whatever means it acts.

3. *Same; what not affected by.*—The twenty-fifth section of the first article, and the fifth section of the thirteenth article of the present constitution of the State do not operate upon railroad charters granted by the State before the adoption of the present constitution, unless such charters were made repealable when granted.

4. *Act of congress of August 4, 1852; when ceases to operate as a grant of the right of way.*—The act of congress of August 4, 1852, which grants to railroad companies the right of way over the public lands in the States where such lands lie, ceases to operate on said lands after they have been entered and purchased by the citizen ; unless the railroad company, claiming such right of way, has located its roadway and filed a plat of the location of the same with commissioner of the general land office of the United States at Washington, in the manner required by said act of congress, before said entry is made.

5. *Alabama & Florida Railroad Company, 5th section of charter of; how requires damages to be assessed.*—The 5th section of the act to amend the charter of the Alabama & Florida Railroad Company, directs how the damages shall be assessed for lands condemned for the use of said company, and this section requires the jury making such assessment to take into consideration the probable advantages the owner of the lands condemned may derive from the construction of the road, in increasing the value of his lands.—Acts 1853-4, p. 258, § 5. *The principles enunciated in the 3d and 4th head-notes of Alabama & Florida Railroad Company v. Burkett, 42 Ala. p. 83, modified.*

6. *Same ; what considerations can not enter into the assessment of damages.* But in making such assessment the jury can not take into consideration the possible damages that may arise from the killing of stock by the cars on said railroad, or the possible necessity of an increase in the quantity of fencing on said land. Such damages would be too remote, as they might never occur.

37

APPEAL from Circuit Court of Butler.
Tried before Hon. P. O. HARPER.

The facts are fully stated in the opinion.

HERBERT & BUELL and SAM'L F. RICE, for appellant.—The act of congress granting the right of way over the public lands of the United States to the railroad, is found in the 10th volume of United States Statutes at Large, page 28. It provides "that when a location for either of said railroads shall be selected, the proper officer of such road shall transmit to the commissioner of the general land office a correct plat of the survey of such road, together with the survey of sites for depots, before such selection shall become operative.—*Morgan's Adm'r v. Nelson's Adm'r.* 43 Ala. 593 ; *McKennon v. McLean,* 2 Dev. & Batt. 79 ; 4th Dev. & Batt. 173.

Now what is it that is to become *operative?* The selection. The selection, location and filing of the map, as required by the law, are all parts of one continuous transaction to be performed by the railroad company, and when the transaction becomes complete by the filing of the map the original selection it is that becomes operative. The doctrine of relation here finds its legitimate application. See authorities last above cited.

The charge refused was that if Burkett, knowing that the survey and location had been definitely made, entered the land before the filing of the map, then he could not recover, &c. Now, if the United States authorized the survey and location, or selection, to be made, with the understanding and upon the express contract that such selection, so made, was to become valid and operative when the map should be filed, then the inchoate right of the road had attached to the land when Burkett entered, and he could not by such entry deprive the road of the power to perfect this right. Burkett took subject to the right of the road, already conditionally attached.

The charge of the court is glaringly wrong in several

material and important respects. It violates some of the plainest and most just rules of law.

1. It is a fixed rule, that a party can have but one satisfaction; the law will not permit him to have two satisfactions for any matter or thing.—*McLane v. Miller*, 10 Ala. 856, and cases there cited.

2. It is also a rule, that "for damages indirectly resulting from the lawful acts of a chartered corporation," (such, for instance, as the liability of live stock to be killed by the cars of a railroad company regularly running upon its road, and in the lawful exercise of its franchise,) "the law affords no remedy." An opposite rule would be destructive to railroad corporations, and therefore highly injurious to the public.—*Rogers v. Ken. & Port. R. R. Co.*, 35 Maine, 319.

3. The law does not allow something for nothing. Nor does it allow in advance damages for what may never occur.

All the foregoing rules are violated by the charge of the court. For, if a railroad corporation has any right at all, it has the right to run its cars upon its road. If, from the exercise of this right, there arises a liability of live stock to be killed, this is clearly a species of "damages indirectly resulting from the lawful acts of a chartered corporation." Such damages can not be considered in determining how much shall be paid to the owner of land (and also of live stock,) for the right of way of the road through his land. If it could, then it is certain the owner would get two satisfactions for the same thing. First, he would get satisfaction for the liability of his stock to be killed by the cars. After getting this, suppose none of his stock is killed, then he gets something for nothing. But suppose his stock is killed or injured, then, under sections 1401 and 1406 of the Revised Code, he is sure to get full compensation for the stock so killed or injured; and the corporation can not reduce the recovery in the suit for stock so killed or injured, by showing that the owner had been previously allowed damages for the liability of his stock to be killed

by the cars. The law would not allow any such proof in a suit for killing or injuring stock.

The true rule is this : the law does not in advance allow damages for the mere liability of live stock to be killed by railway cars. The law allows damages only for what has occurred, not for what may or may not occur—for what may never result in damage. This is the dictate of reason and justice. This rule is not repudiated by any decision known to us. But if it were, then this court ought to dis-regard such decision and stand by reason, justice, and the law.

The decision in *Ala. & Flor. R. R. v. Burkett,* reported in 42 Ala. 84, is manifestly wrong, in so far as it holds that the increased value of the lands can not be taken into consideration in assessing damages. All the authorities hold that a charter of this kind is a contract. If this be the case, not even a constitution subsequently adopted can destroy the rights given by that charter. This seems too plain to need a citation of authorities in support of the proposition.

WATTS & TROY, *contra.*—1. The charge given is fully supported by the decision of the court in this case when it was heretofore before this court.—See *Ala. & Flor. R. R. Co. v. Burkett,* 42 Ala. 83 ; and *M. & W. P. R. R. Co. v. Varner,* 19 Ala. 185.

This charge required the jury to assess the damage done at the time the grading was done. And it was the inconvenience to Burkett, and his liabilities to injury in consequence of the building of the road, that the jury might look to as tending to diminish the value of his land at that time.

Under this charge, no double damage could arise. There was no right given to the jury to assess damages for actual killing of stock, and hence the argument of counsel on this point is wholly untenable.

2. The charge asked was properly refused.

It disputed the right of Burkett to recover any damages whatever. It disputed the right of Burkett to the land.

The Railroad Company was estopped by its own pleadings of record from doing either. The application was to have damages assessed to Burkett for injury done him by the road. This application was made by the Railroad Company itself. And in this application, it alleged that Burkett was the owner of the land, and that he and it could not agree on the amount of damage.

3. But even if the Company were not thus estopped by the record from disputing Burkett's title to the land, and his right to damages against the Railroad Company, Burkett had a good title to the land before any right of the Railroad Company accrued. He purchased it from the United States, and paid his money for it, before any right vested in the Railroad Company. Under the act of congress, no right of way or other easement could vest in the Company until the proper officers of the Company transmitted to the commissioner of the general land office, at Washington City, a correct plat of the survey of said road, together with the survey of sites for depots. Until this was done, the "selection" did not "become operative;" and until this was done, the public lands were subject to entry and sale by the United States.—See Act of Congress, p. 28, vol. 10, U. S. Stat. at Large, § 3.

The facts in the bill of exceptions show that Burkett made the entry and paid his money to the United States nearly one month before the map of survey was filed in the general land office.

Burkett had no notice, as far as the bill of exceptions shows, of the survey of the route, and if he had, it would make no difference. He is, then, a purchaser for value, without notice. The Railroad Company claims as a mere gratuity, and must stand as a mere voluntary donee.

Now, the rule is well settled, that a purchaser for value from the vendor has a better right than a voluntary donee, unless the voluntary donee's rights have been perfected and fully consummated before the purchaser for value bought from the vendor. Now, even if the voluntary grant had been perfected, unless the purchaser for value had notice at the time of his purchase, his title is better

than that of the donee.—See 3d head-note to *Wilson v. Eddins*, 1 Ala. 237 ; *Stokes v. Jones*, 21 Ala. 731 ; *Carter v. Castleberry*, 5 Ala. 278.

The act of congress was intended to make a mere gratuity to railroad companies and others; and congress had the right to impose such conditions as it pleased. And the companies have no rights under the act until they have strictly complied with its provisions. Especially would this be so against a *bona fide* purchaser for value.

The reasoning in *Ala. & Flor. R. R. Co. v. Burkett*, is unanswerable in what is there decided as to the mode of assessing damages. It is unnecessary to cite authority to sustain that decision.

PETERS, J.—This is a proceeding to assess the damages sustained by appellee, (said Burkett,) for land condemned for the use of the said Alabama and Florida Railroad Company, which was instituted under the provisions of the act incorporating said company.—Pamph. Acts, 1849–1850, p. 173–176 ; Act No. 125, § 9 ; Pamp. Acts 1853–1854, p. 258–259 ; Act No. 401, § 5. There was a trial in the circuit court of Butler county at the fall term, 1869, when a verdict and judgment was rendered in favor of said Burkett for $630 and costs. From this judgment said railroad company appeals to this court. And the errors here assigned arise upon the charge of the court given and the charge refused, as shown in the record.

The evidence in the court below tends to show that said Burkett owned one hundred and twenty acres of land, through which the railway of said company diagonally passes. It was also shown that Burkett had entered and purchased said land from the United States at the land office in the town of Greenville, in this State, under the graduation laws of the United States, on the first day of April, 1856 ; and that the survey of said railroad fixing definitely its location by final survey through appellee's land, had been made before the said first day of April, 1856, but the map showing said definite location of said railroad through said land had not been filed in the United

States land office at Washington until the first day of May, 1856, when it was so filed in strict conformity with all the requirements of an act of congress, approved Aug. 4, 1852, entitled " An act to grant the right of way to all rail and plank roads and macadamized turnpikes passing through the public land belonging to the United States."—(10 U. S. States at Large, pp. 28–29.)   And that the said railroad company had strictly complied with all the requirements of said act of congress after said location thereof over said land, and that said railroad had been continuously in operation since the year 1860, when it was completed through said lands, and said lands were, when said railroad was first surveyed and located through them and continued to be until Burkett entered them, subject to sale at private entry under the law of the United States.

Upon this testimony, the court charged the jury, " that if they should find for the plaintiff, (Burkett,) under the preceding charge of the court, (this charge is not set out in the transcript,) then they must assess to the plaintiff the actual damage done to his land by the grading and running of the railroad through his land, taking into consideration the inconveniences arising from the fact that it was more difficult to go from one portion of the land to another, that more fencing was required, estimating the value of the land actually taken by the road, and also taking into consideration the fact that *defendant's* (plaintiff's?) stock were liable to be killed by the cars on the railroad, and that in making this estimate of the damage done, they were not at all to take into consideration for the purpose of reducing the amount of damages, the enhanced value of the land caused by building or prospect of building the said railroad, and that they must estimate the damages at the time when the grading was done, and give interest from that time." To this charge and every part of it said railroad company excepted.

The defendant, (said railroad company,) also asked the court to charge the jury, " that if the location of the road had been definitely made by survey along the line upon which it was finally constructed on plaintiff's land, while it

was public land of the United States and subject to sale at private entry, and if plaintiff after this location was so made by a final survey, knowing that it had been so made, entered the land at the United States land office, then the plaintiff can not recover in this action, although at the time he so entered it, the defendants had not filed in the United States land office at Washington a map of the definite location of said railroad, provided said defendant subsequently filed said map as required by the act of congress entitled as above set forth, and approved August 2, (4,) 1852." This charge the court refused, and defendant excepted.

These charges raise two questions, the latter of which will be first disposed of. The court properly refused the charge last above cited. This appears from the language of the *fourth* proviso to the act of congress above cited. It is in these words : "*Provided further*, That when a location for either of said railroads or plankroads, macadamized turnpikes, or sites for depots on the line of such road or roads, shall be selected, the proper officers of such road or roads shall transmit to the commissioner of the general land office a correct plat of the survey of said road or roads, together with the survey of sites for depots, before said such selection shall become operative."—10 U. S. Stat. at Large, p. 28, ch. lxxx, § 3. Here the entry was made on the first day of April, 1856, and the plat of the survey of the railroad was not transmitted to the commissioner of the general land office, as required by the act of congress, until the first day of May afterwards. This was too late to give the railroad company a preference over the purchaser from the United States to the land in controversy. The grant was not operative until the plat was transmitted to the commissioner at Washington. And if, in the mean time, the land was sold to the citizen before the railroad company had placed its affairs in a condition to be entitled to the right of way over it as public lands, then it became the private property of the citizen, and the national government lost its control over it, for the purposes of said act of congress. After this, congress had no power

to dispose of it.—Const. U. S. Art. V; Pasch. Const. U. S. p. 258, and notes. This *proviso* is a limit on the law of congress.—15 Pet. 445. The congressional grant of the right of way is in this language: "*Be it enacted, &c.*, That the right of way shall be, and is hereby granted, to all rail, plankroad or macadamized turnpike companies that are now, or that may be chartered within ten years hereafter, over and through any of the public lands of the United States over which any rail or plankroad, or macadamized turnpike are, or may be, authorized by an act of the legislature of the respective States in which public lands may be situated; and the said company or companies are hereby authorized. to survey or mark through the public lands to be held by them for the track of said road, one hundred feet in width; *Provided*, That in cases where deep excavation or heavy embankment is required for the grade of such road, then at such places a greater width may be taken by said company, if necessary, not exceeding in the whole two hundred feet."—10 U. S. Stat. at Large, p. 28, ch. lxxx, § 1. Although this law gives a present right to pass over the public lands with a railroad, plankroad, or macadamized turnpike, this right ceases by the terms of the act as soon as the lands become private property. And this happens if the lands are entered by the citizen before this right becomes operative. This is the case in this instance. Then the court did not err in refusing the charge to this effect, above quoted.

But this cannot be said of the charge which was given and excepted to, as above shown. That charge cannot be supported. The section of the present constitution of the State, by which the citizen is protected in the use and in the right to his private property, declares "that private property shall not be taken or applied for public use, unless just compensation be made therefor; nor shall private property be taken for private use or for the use of corporations, other than municipal, without the consent of the owner; Provided, however, that laws may be made securing to persons or corporations the right of way over the lands of either persons or corporations and for works of

internal improvement, the right to establish depots, stations and turn-outs; but just compensation shall, in all cases, be first made to the owner."—Const. Ala. 1867, Art. 1, § 25. But this section and section 5 of article 13 of the present constitution, which greatly modifies the future laws upon such subjects, (Const. Ala. 1867, Art. xiii. § 5,) were not parts of the constitution of this State at the time the Alabama & Florida Railroad Company was incorporated. This charter is a contract made by the State with the corporators, and as such it is protected in all the privileges granted by it, by the constitution of the United States. *Dartmouth College v. Woodward*, 4 Whea. 518, 629; *Bridge Proprietors v. Hoboken Company*, 1 Wall. 146, 147; *Micou v. Pres't & Directors Tallassee Bridge Company*, in Mss. June 2, 1871. The State cannot, therefore, impair the franchises secured by the charter, either by its constitution or by its laws. The prohibition is on "the State," which includes a prohibition both upon the legislature and the convention.—Const. U. S. Art. 1, § 10; Pasch. Const. U. S. p. 153 and notes. One of the sections of the charter of this company is as follows: "Be it enacted, &c., That in all cases where land is condemned to the use of said company, the jury, in assessing the damages sustained by the owner, shall take into consideration the increased value which will result to such lands from the construction of the road, and shall, before making the assessment, be sworn truly to enquire and assess the damages such owner may sustain, taking into consideration the probable advantages he may derive from the construction of the road, in increasing the value of his lands."—Pamph. Acts, 1853-4, pp. 258-59; Act No. 401, § 5; Pamph. Acts, 1849-50, p. 173; Act No. 125, § 9. It is now the better opinion, that the State legislature may permit such condemnation of lands belonging to the citizen, to the use of railroads, and may prescribe the mode of estimating the damage to the land thus subjected to the use of a railway company, if there is no prohibition in the State constitution which forbids it.—*Bloodgood v. Mohawk & Hudson Railroad Company*, 14 Wend. 51; S. C. 18 Wend. 9; 2 Amer. Railw. Cas. 421; *Rogers v.*

*Kennebec & Portland Railroad Company,* 35 Maine, 349; *Johnson v. Joilet, &c., Railroad Company,* 23 Ill. 202; *Bonaparte v. Camden & Amboy Railroad Company,* 1 Bald. C. C. 205.

Under the law of the charter of this road, all the owner of the land should be entitled to receive is, "just compensation." These terms imply something more liberal than the mere market price of the thing taken. They open the inquiry so as to include an estimate of the benefits as well as the injuries, and the adjustment of the difference between them. Compensation is an equitable term, and literally means the balancing of one thing against another. Webster's Dict. Unabr., word Compensation, p. 261. It imports something different from a mere payment of a sum of money for the injury done to the land. It looks to compensation on both sides. That is, a just balancing of the advantages against the disadvantages. The charge of the court, which was given and excepted to, was not in conformity with this construction of the statute law, which governs this case. It was therefore erroneous. But a different rule must govern in cases arising under charters granted since the adoption of the present constitution of the State.—Const. Ala. Art 1, § 25; Art. xiii., § 5.

The charge given was also vicious for another reason. By it the court directs the jury, in estimating the damages, they are to take into consideration that "more fencing was required" on the land, and the farther fact, that the "plaintiff's stock were liable to be killed by the cars on the railroad." Both these were injuries that might not occur. It has not been found necessary to fence railroads that pass through enclosures or farms. These additional fences are usually obviated by the simple contrivance of a pit, where the roadway crosses a fence or enclosure around a lot or farm. And it may also happen that no stock, the property of the plaintiff, may ever be killed by the cars on the railroad. And if it should be, there is another mode presented to recover damages for the injury thus occasioned.—Rev. Code, §§ 1399, 1400, 1401, 1406; *Nashville & Decatur Railroad Company v. Comans,* 45 Ala. 437. Besides, if dam-

ages for such prospective killing and injury of stock should be allowed to be recovered in this way, and then again as the above cited statute prescribes, this would be a double satisfaction for the same injury, which would not be a just compensation for the property injured. A double satisfaction is not allowed.—*McLane v. Miller*, 10 Ala. 856. Moreover, such damages would be too remote.—Sedgw. on Dam. pp. 57, 58, 4th ed. It is by no means certain that they would ever be occasioned by the railroad.

The judgment of the court below is reversed and the cause is remanded for a new trial.