# Swann & Billups *v.* Lindsey.

*Ejectment for Lands claimed under Railroad Grant.*

70   507
99   477
70   507
120   530

70   507
f124 230

70   507
128   389

70   507
136   321
136   322
136   323

1.* *Grant of lands in aid of railroads, by act of Congress of June 3d, 1856 ; what title passed thereby.*—Under the provisions of the act of Congress approved June 3d, 1856, "granting public lands in alternate sections to the State of Alabama, to aid in the construction of certain railroads" (11 U. S Statutes at large, p. 17), and the subsequent act of April 10th, 1869, renewing said grant (16 *Ib.* 45), a present title to the lands passed to the State, subject to be devested, by proper action taken, for breach of the condition subsequent annexed to the grant ; and though this title did not attach to any specific sections of land, until the route of the particular railroad, to aid in the construction of which the grant was made, was definitely located within the time allowed by said acts of Congress, no title remained in the United States subject to entry or sale.

2. *Same.*—Under said acts of Congress, the State held the lands so granted in trust for the purposes specified, limited by the restrictions and conditions expressed in the grant ; having absolute power to sell one hundred and twenty sections, within a continuous length of twenty miles of the road, before any work was done on it, and the further power to sell, as the work progressed, the same number of additional sections, within other twenty continuous miles, on the Governor's certificate to the Secretary of the Interior that such twenty continuous miles of the road were completed ; and when any of the lands were sold and conveyed in pursuance of these powers, the purchaser acquired an absolute title, whether the railroad was ever completed or not.

3. *Same ; legislative joint resolutions of 1857-8, transferring said lands to railroad company.*—Beyond the first one hundred and twenty sections, as to which an absolute power of sale was given, the State had no authority to sell or dispose of any of these lands, even to the railroad company itself, except in portions of twenty miles as the road progressed, and could not convey to its grantee or appointee any greater power or interest than was vested in itself. The joint resolutions of the General Assembly, approved January 30th, 1858, by which it was declared that the lands "are hereby disposed of, granted to, and conferred upon" the railroad particularly designated, "to be used and applied by said company upon the terms, conditions and restrictions in said act of Congress contained," although strong words of grant and disposition are used, "which would, ordinarily, convey all the title of the grantor," must be construed in connection with the act of Congress, and do not convey to the railroad company any greater power or interest than the State itself had ; and notwithstanding these joint resolutions, the legal title to said lands, beyond the first one hundred and twenty sections, remained in the State until the railroad was completed.

4. *Same ; statute of limitations, as defense to action for said lands.* Statutes of limitation do not, unless so expressed, run against the State,.

[Swan & Billups v. Lindsey.]

or the United States, nor does the statute begin to run until there is some one entitled to sue; and the title to these lands remaining in the State until the railroad was completed, less than ten years before the suit was brought, the statute of limitations is no defense to the action.

APPEAL from the Circuit Court of Jefferson.

Tried before the Hon. WM. S MUDD.

This action of ejectment was brought to recover a tract of land, described as "the south-east quarter of the south-west quarter, and the south-west quarter of the south-east quarter, of section one (1), township seventeen (17), range one (1) west;" and was commenced on the 11th March, 1878. The declaration contained a count on a demise from the State of Alabama, " on, to-wit, the 3d June, 1856;" and a count on a demise from John Swann and John A. Billups, "on, to-wit, the 8th February, 1877." James Lindsey was summoned as the real defendant; and he appeared, and pleaded, "in short by consent, not guilty, with leave to give in evidence any matter or fact which might be specially pleaded, in the same manner as if specially pleaded." The trial was had, as the bill of exceptions states, " upon the following statement of facts, which were agreed on by the parties."

" 1. The lands sued for are in Jefferson county, Alabama, and formed a part of the lands granted and conveyed to the State of Alabama by the act of Congress of the United States, approved June 3d, 1856, entitled ' An act granting public lands, in alternate sections, to the State of Alabama, to aid in the construction of certain railroads in said State;' which act is hereby referred to, and made a part of this bill of exceptions.

" 2. The lands sued for formed a part of those embraced in and governed by said act of Congress of June 3d, 1856, and the following later acts of Congress: 1st, the act approved March 3d, 1857, amending said act of June 3d, 1856; 2d, the act approved April 10th, 1869, entitled ' An act to renew certain grants of lands to the State of Alabama;' which several acts are hereby referred to, and made parts of this bill of exceptions.

" 3. On the 2d March, 1870, the Alabama and Chattanooga Railroad Company made and executed a mortgage, under the provisions of the act of the General Assembly approved February 11th, 1870, entitled ' An act to loan the credit of the State of Alabama to the Alabama and Chattanooga Railroad Company, for the purpose of expediting the construction of the railroad of said company within the State of Alabama;' by which mortgage, the lands sued for, with others, were conveyed to the State of Alabama, in accordance with said act last mentioned, to secure the loan of said State to said company made in accordance with that act; which act was duly recorded," and is here copied in the bill of exceptions.

[Swan & Billups v. Lindsey.]

"4. On the 8th February, 1877, the State of Alabama conveyed the lands now sued for, with others, to the plaintiffs in this action, John Swann and John A. Billups, as trustees, &c.; which said conveyance is" here set out.   "Said conveyance was made under and by virtue of the act of the General Assembly of Alabama approved February 23d, 1876, entitled 'An act to ratify and confirm the settlement of the existing indebtedness of this State as proposed in the report of the commissioners appointed under the act approved December 17th, 1874, and which was communicated to the General Assembly by message of the Governor of the 24th January, 1876, and to carry said settlement into effect by the issuance of new bonds of this State, at a reduced rate of interest, in adjustment of a portion of said indebtedness, and the surrender of certain securities held by the State in discharge of another portion of said indebtedness.'   All the acts of Congress, and all the acts of the General Assembly of Alabama, referred to in said conveyance, are made parts of this bill of exceptions."

"5. One Matthew Allen entered the lands sued for, at the United States land-office in Tuskaloosa, on the 1st day of March, 1859, and received a certificate of entry," which is here set out.   "Said Allen paid the whole purchase-money for said lands, to the officer of said land-office, and went into possession of said lands, and openly and notoriously retained and held said lands, honestly and adversely claiming the same, under said certificate, till the same was, on or about the 3d March, 1860, sold and conveyed by him to J. W. Bass, and afterwards sold by said Bass to the defendant in this suit; and said defendant has held said lands openly and notoriously, honestly and adversely claiming the same under said certificate and conveyance, continuously from that time, such holding extending back to the time of the original entry by said Allen; and he was in possession of said lands at the commencement of this suit. And it is agreed, that the defendant, and those under whom he claims, have had such adverse possession of said lands, under color of title, as would bar a recovery in this action, if, upon the other agreed facts in the case, the statute of limitations would bar the action.

"The joint resolutions of the General Assembly of the State of Alabama approved January 30th, 1858, 'designating the application of certain lands granted by Congress to the State of Alabama,' were read in evidence on the trial, by the defendant; and it is agreed that said joint resolutions, as published (Session Acts, 1857–8, p. 430), may be made a part of this bill of exceptions.   It is agreed and admitted, also, that the Wills Valley Railroad Company, under the acts of the General Assembly passed in 1868, duly became the purchaser of all the rights,

property and franchises of the North-East and South-West Ala-
bama Railroad Company, and then (in 1868) duly became a
corporation, known, then and ever since, as the Alabama and
Chattanooga Railroad Company, and clothed with all the rights,
property and franchises of the Wills Valley Railroad Company,
and of the North-East and South-West Alabama Railroad Com-
pany. It is admitted, also, that no part of the road of the
North-East and South-West Alabama Railroad Company, in
Alabama, had been constructed or completed in 1868; and that
said railroad was completed between 1868 and June, 1870, by
the Alabama and Chattanooga Railroad Company; and that
the line of said railroad company was duly located, between
March, 1868, and March, 1869; and that all the acts of the
General Assembly of the State of Alabama, relating to any and
all of said railroad companies, or to said lands, as the same are
published, shall form parts of this bill of exceptions, without
being copied herein."

The act of Congress approved June 3d, 1856, may be found
in the United States Statutes at large, vol. 11, pp. 17–18. The
following are all its provisions material to this case: *Sec.* 1.
"That there be, and is hereby, granted to the State of Ala-
bama, for the purpose of aiding in the construction of rail-
roads, from the Tennessee river, at or near Gunter's Landing,
to Gadsden on the Coosa river; from Gadsden, to connect with
the Georgia and Tennessee, and Tennessee line of railroads,
through Chattooga, Wills, and Lookout Valleys; and from
Elyton to the Tennessee river, at or near Beard's Bluff, Ala-
bama, every alternate section of land designated by odd num-
bers, for six sections in width on each side of each of said roads.
But, in case it shall appear that the United States have, when
the lines or routes of said roads are definitely fixed, sold any
sections, or any parts thereof, granted as aforesaid, or that the
right of pre-emption has attached to the same; then it shall be
lawful for any agent or agents, to be appointed by the Gov-
ernor of said State, to select, subject to the approval of the
Secretary of the Interior, from the lands of the United States
nearest to the tiers of sections above specified, so much land in
alternate sections, or parts of sections, as shall be equal to such
lands as the United States have sold, or otherwise appropriated,
or to which the rights of pre-emption have attached as afore-
said; which lands, thus selected in lieu of those sold and to
which pre-emption rights have attached as aforesaid, together
with the sections and parts of sections designated by odd num-
bers as aforesaid, and appropriated as aforesaid, shall be held
by the State of Alabama for the use and purpose aforesaid:
*Provided*, that the land to be so located shall in no case be
further than fifteen miles from the lines of said roads, and

[Swan & Billups v. Lindsey.]

selected for. and on account of each of said roads: *Provided further*, that the lands hereby granted, for and on account of said roads · severally, shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever: *And provided further*, that any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads through such reserved lands; in which case, the right of way only shall be granted, subject to the approval of the President of the United States."

*Sec.* 2. "That the sections and parts of sections of land which, by such grant, shall remain to the United States, within six miles on each side of said roads, shall not be sold for less than double the minimum price of the public lands when sold; nor shall any of said lands become subject to private entry, until the same have been first offered at public sale at the increased price."

*Sec.* 3. "That the said lands hereby granted to the said State shall be subject to the disposal of the legislature thereof, for the purposes aforesaid, and no other; and the said railroads shall be and remain public highways," &c.

*Sec.* 4. "That the lands hereby granted to said State shall be disposed of by said State only in manner following, that is to say: that a quantity of land not exceeding one hundred and twenty sections for each of said roads, and included in a continuous length of twenty miles of each of said roads, may be sold; and when the Governor of said State shall certify to the Secretary of the Interior that any twenty continuous miles of any of said roads is completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for each of said roads having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each of said roads, may be sold; and so, from time to time, until said roads are completed; and if any of said roads is not completed within ten years, no further sale shall be made, and the lands unsold shall revert to the United States."

*Sec.* 6. "That a grant of lands shall be made to said State, to aid in the construction of the following roads, to-wit: ＊ ＊ the North-East and South-Western railroad, from near Gadsden, to some point on the Alabama and Mississippi State lines

[Swan & Billups v. Lindsey.]

in the direction of the Mobile and Ohio railroad, with a view to connect with the said Mobile and Ohio railroad; * * and that alternate sections of the public lands, to the same extent, and in the same manner, and upon the same limitations and restrictions in every respect, shall be, and *is* hereby made, to aid in the construction of the roads in said State mentioned in this act : *Provided*, that the lands hereby granted to said State for the purpose of constructing a railroad from the north-east to the south-western portion of said State, lying north-west of Elyton, shall be assigned to such road as may be designated by the legislature of said State."

The act approved April 10th, 1869, entitled "An act to renew certain grants of land to the State of Alabama," enacts as follows : " That so much of the grant of lands made to the State of Alabama by the act of Congress approved June 3d, 1856, entitled," &c., " as were granted to assist in the building of railroads 'from near Gadsden to some point on the Alabama and Mississippi State line, in a direction to the Mobile and Ohio railroad, with a view to connect with the said Mobile and Ohio railroad,' and 'from Gadsden to connect with the Georgia and Tennessee and Tennessee line of railroads, through Chattooga, Wills, and Lookout valleys,' is hereby revived and renewed, subject to all the conditions and restrictions contained in the act referred to ; and subject to the further limitation, that if either of the said railroads is not completed within three years from the passage of this act, no further sale shall be made for the benefit of such railroad, and the lands unsold shall revert to the United States : *Provided*, that the lands granted by the act hereby revived, except mineral lands, shall be sold to actual settlers only in quantities not greater than one quarter-section to any one purchaser, and for a price not exceeding two dollars and fifty cents per acre."—U. S. Statutes at large, vol. 16, pp. 45–6.

The Wills Valley Railroad Company was chartered by an act of the General Assembly approved February 3d, 1852; and by the 3d section of its charter it was enacted, "that said railroad shall extend from some convenient point on the Alabama and Tennessee rivers railroad, at or near the farm of James Hampton ; thence the most practicable route, through the county of DeKalb, to the Georgia line, in a direction to intersect the Georgia and Tennessee railroad, at some convenient point in Lookout valley."—Sess. Acts 1851-2, pp. 178–83. The North-East and South-West Alabama Railroad Company was incorporated by an act of the General Assembly approved December 12th, 1853, in which the route of its road was described as running from some point on the boundary line between Alabama and Mississippi in the direction of Marion,

[Swan & Billups v. Lindsey.]

Lauderdale county, Mississippi, or the point of intersection of the Southern railroad with the Mobile and Ohio railroad, through the corporate limits of Eutaw, Tuskaloosa, and Elyton, "and thence in a north-easterly direction, to connect with some one or more of the railroads leading to Knoxville, Tennessee, or as near the points and course here designated as is consistent with the general route here indicated."—Sess. Acts 1853-4, pp. 270-80.

The "*Joint Resolutions* designating the application of certain lands granted by Congress to the State of Alabama," which were approved on the 30th January, 1858, are in these words: " *Whereas*, the Congress of the United States, by a certain act approved the 3d day of June, 1856, made a grant of public lands to the State of Alabama, to aid in the construction of the North-East and South-West railroad, from near Gadsden, to some point on the Alabama and Mississippi State line in the direction of the Mobile and Ohio railroad, with a view to connect with said Mobile and Ohio railroad; *and whereas*, it is provided in said act, that the lands thereby granted to said State, for the purpose of constructing a railroad from the north-east to the south-west portion of said State, lying south-west of Elyton, shall be assigned to such road as may be designated by the legislature of said State: *Therefore*—Sec. 1. *Be it enacted*," &c., "that, in pursuance of the power in them vested by said act, they hereby designate the North-East and South-West Alabama railroad, running south-west from Elyton, by way of Tuskaloosa, Eutaw, and Livingston, and connecting with the Mobile and Ohio railroad at Meridian, as the road to which the lands granted by said act, lying south-west of Elyton, shall be assigned, and to aid in the construction of which said lands shall be held under the provisions of the act of Congress aforesaid." Sec. 2. "That the lands, rights and privileges, granted to and conferred upon the State of Alabama by the act of Congress aforesaid, to aid in the construction of certain railroads, be, and the same are hereby accepted, upon the terms, conditions and restrictions therein provided." Sec. 3. "That so much of the said lands, interest, rights and privileges, as are or may be granted and conferred, in pursuance of said act of Congress, to aid in the construction of the North-East and South-Western railroad, from near Gadsden to some 'point on the Alabama and Mississippi State line, in the direction of the Mobile and Ohio railroad, with a view to connect with the said Mobile and Ohio railroad, are hereby disposed of, granted to, and conferred upon the North-East and South-West Alabama Railroad Company, a body corporate existing under the laws of the State of Alabama; to be used and applied by said company upon the terms, conditions and restrictions, in said act of Con-

33

gress contained." SEC. 4. "That so much of the said lands, interest, rights and powers, and privileges, as are or may be granted and conferred, in pursuance of the said act of Congress, to aid in the construction of a railroad from Gadsden to connect with the Georgia and Tennessee line of railroads, through Chattooga, Wills, and Lookout valleys, are hereby disposed of, granted to, and conferred upon the Wills Valley Railroad Company, a body corporate existing under the laws of Alabama; to be used and applied by said company upon the terms, conditions, and under the restrictions in said act of Congress contained. *Provided*, that nothing in these joint resolutions contained, nor the passage and approval of the same first in point of time, shall be construed to give the road to which the land is hereby appropriated any preference, where its claims to lands come in conflict with the claims of any other road provided for in said act of Congress."—Sess. Acts 1857–8, pp. 430–31.

On the 6th October, 1868, an act of the General Assembly was approved, authorizing the consolidation of the South-East and North-West Alabama Railroad Company and the Wills Valley Railroad Company into a new corporation, to be known as the Alabama and Chattanooga Railroad Company; and declaring that said new corporation "shall be entitled to all the functions, rights, privileges and immunities granted or pertaining to either" of the consolidated companies, "or to both of them, either by the laws of this State, or of other States, or of the United States," "and shall be invested with all the property of every description, real, personal and mixed, including * * lands improved and unimproved," &c.—Sess. Acts of 1868, pp. 207–09. The Alabama and Chattanooga Railroad Company having been organized under the provisions of this act, another act was passed for its benefit, approved on the 11th February, 1870, entitled "An act to loan the credit of the State of Alabama to the Alabama and Chattanooga Railroad Company, for the purpose of expediting the construction of the railroad of said company within the State of Alabama;" under the provisions of which act, the State issued its bonds to the amount of $2,000,000 in favor of the railroad company, receiving in exchange the first-mortgage bonds of the company to the same amount, on all its lands and property.—Sess. Acts of 1869–70, pp. 89–92. The mortgage executed by the company to secure the payment of these bonds, dated March 2d, 1870, is the mortgage referred to in the 3d paragraph of the admitted facts, *supra.* The said railroad company afterwards became bankrupt, and the State became the purchaser of all its assets at a sale made under a decree of the Bankrupt Court. On the settlement of the State's indebtedness pursuant to the terms of the act approved February 23d, 1876, known as the "Debt Settle-

ment Act" (Sess. Acts 1875,-6, pp. 130–49), the holders of the bonds issued by the State in aid of this railroad company having surrendered them, in exchange for the new bonds authorized by said act to be issued, a deed was executed by the Governor, in the name of the State, on the 8th February, 1877, by which he assigned and conveyed to John Swann, as trustee selected by the bondholders, and John A. Billups, trustee appointed on behalf of the State, all the lands and property of every kind which the State held and claimed under the mortgage of the railroad company, and under its purchase at the sale in bankruptcy, to be held and applied by them for the benefit of the holders of the new bonds; and the trustees were authorized to sell the lands, and, after paying ten per cent. of the proceeds of sale into the State treasury, to distribute the residue *pro rata* among the holders of the new bonds. This is the deed under which title is asserted by said Swann and Billups in this suit.

"Upon the foregoing agreed facts, the court charged the jury, that they must find for the defendant; to which charge the plaintiffs duly excepted," and they now assign it as error.

RICE & WILEY, for appellants.—1. Congress may grant public lands to aid or secure the construction of railroads, or to accomplish any other purpose beneficial to the public, upon such terms and conditions as Congress may choose to insert in the grant.— *United States v. Hall*, 98 U. S. R. 351; *Schulenberg v. Harriman*, 21 Wallace, 59; *Farnsworth v. M. & P. Railroad Co.*, 92 U. S. 65. Under such a grant, the terms, conditions and restrictions imposed, constitute the supreme law governing the property granted.—Cases cited.

2. The act of Congress of June 3d, 1856, involved in this case, is a grant of public lands to the State of Alabama, "for the purpose of aiding in the construction" of the railroads therein referred to, among which are the two railroads now consolidated into the Alabama and Chattanooga Railroad Company; and the essential conditions and restrictions of the grant are contained in the second proviso of the first section, and in the third and fourth sections. These provisions declare, that the lands granted "shall be *exclusively applied* in the construction of that road for and on account of which such lands are hereby granted, and *shall be disposed of only as the work progresses*, and the same shall be applied to no other purpose whatsoever;" that the lands "shall be subject to the disposal of the legislature, for the purposes aforesaid and no other;" and that the lands hereby granted "*shall be disposed of by said State only in the manner following*"—viz., that one hundred and twenty sections, included in a continuous length of twenty miles of the road, "*may be sold;*" that similar quantities, in

[Swan & Billups v. Lindsey.]

cluded in similar continuous portions, "may be sold" from time to time, on the certificate of the Governor to the Secretary of the Interior, as the work is finished, "until said roads are completed; and if any of said roads is not completed within ten years, no further sale shall be made, and the lands unsold shall revert to the United States." Under this grant, the legal title to the lands sued for was vested in the State of Alabama, as trustee, so soon as the particular railroad, in aid of which the grant was made, was definitely located.—*Schulenberg v. Harriman*, 21 Wallace, 44; *Farnsworth v. M. & P. Railroad Co.* 92 U. S. 49. Besides this legal title, the State had a restricted power of sale; but this power was not coupled with any interest in or to the lands, and the manner in which the power of sale should be exerised, as prescribed by the fourth section, continued imperative until the construction and completion of the railroad. "No conveyance in violation of the terms of this act, the road not having been constructed, could pass title to the company."—21 Wallace, 59; 2 Otto, 65; 101 U. S. 665. The word *sale*, or *sold*, has a fixed legal meaning, which must be given to it here.— *Williamson v. Berry*, 8 Howard, 544; *Gunter v. Leckey*, 30 Ala. 591.

3. The joint resolutions of January 30th, 1858, can not be construed and considered as a *sale* of the lands to the railroad company. Neither of the railroads was then constructed, nor was twenty continuous miles of either road completed. The trust was then executory, and the State could not sell and convey any title. As a conveyance, these resolutions were at that time in direct contravention of the act of Congress, and were, to that extent, inoperative and void.—Smith on Statutes, § 667; 2 Perry on Trusts, §§ 783, 785, 779, 769, 768, note 6; 11 Vesey, 482, note 2; 6 Otto, 316; *Pettit v. Pettit*, 32 Ala. 288; 2 Sugden on Powers, 507, 456, 479, mar.; *Hardy v. Br. Bank*, 15 Ala. 730; *Scipio v. Wright*, 101 U. S. 675. These resolutions are void also, as a conveyance, for uncertainty. *Deloach v. State Bank*, 27 Ala. 437; *Burrall v. Jacot*, 1 Barb. S. C. 165.

4. The statute of limitations does not run against the State, nor against the United States.— *United States v. Hoar*, 2 Mason, 312; *Swearingen v. United States*, 11 Gill & J. 373; *Iverson & Robinson v. Dubose*, 27 Ala. 418; *Farley v. Smith*, 39 Ala. 38. On this point, the case of *Miller v. The State*, 38 Ala. 600, is not applicable; for, here, the State had not executed the trust, and was not a mere nominal party holding for the use and benefit of another; nor could the trust be executed while the road was not completed, until all the lands were exhausted by successive sales. That event never occurred before May, 1871; and until that time the title remained in the

[Swan & Billups v. Lindsey.]

State as trustee, and the trust was unexecuted.—*Gunn v. Barrow*, 17 Ala. 743; 2 Brickell's Digest, 496, §§ 86–96. Until the completion of the railroad, the railroad company had no title to the lands granted, nor were the lands subject to taxation as the property of the railroad company.—*Railroad Co. v. Prescott*, 16 Wallace, 603. Nor could the statute of limitations operate on the lands, so long as the right of reversion remained in the United States; for that would allow a State statute to embarrass a right of the United States.—16 Wallace, 603; 2 Mason, 312; 11 Gill & J. 373; *U. S. v. White*, 2 Hill, N. Y. 59; *State Bank v. Brown*, Scam. 106.

5. The lands here sued for were entered by a private person, under whom the defendant claims, on the 1st March, 1859, after the railroad had been definitely located. This prior location of the railroad withdrew the lands from entry, and rendered the entry and certificate utterly void.

· HEWITT & WALKER, *contra.*—The act of Congress vested the legal title to the granted lands in the State; but the State held merely as a naked trustee, without any interest whatever. Though the defendant acquired no title to the lands by the entry of his vendor, he has acquired a good title under the statute of limitations.—*Miller v. The State*, 38 Ala. 600; *Moody v. Fleming*, 4 Geo. 115. The State parted with all its title and interest by the legislative resolutions of 1858, which were adopted prior to the entry under which the defendant claims.

STONE, J.—The act of Congress, approved June 3d, 1856 11 Stat. at large, 17–8), granted to the State of Alabama every alternate section of land designated by odd numbers, for six miles on each side of the railroad track, when the line of the road is definitely fixed, to aid in the construction of the North-East and South-Western railroad, "from near Gadsden to some point on the Alabama and Mississippi State line, in the direction of the Mobile and Ohio railroad," with a view to connect with said Mobile and Ohio railroad. This road not being completed within ten years, the grant was renewed by act approved April 10th, 1869, and a further time allowed of three years from that date, within which to complete the road.—16 Stat. at large, 45. The North-East and South-Western railroad became merged in the Alabama and Chattanooga Railroad Company, and its corporate privileges and rights of property passed to the latter company. The road, in its new combination, was completed within the three years, and the lands thereby secured. By joint resolutions of the legislature of Alabama, approved January 30, 1858, the North-East and South-West Alabama

railroad was designated as the road entitled to the lands granted to aid in the construction of the road "from near Gadsden to some point on the Alabama and Mississippi State line, in the direction of the Mobile and Ohio railroad."—Sess. Acts 1857–8, 430–1. As we have said, the corporate powers and property rights of the North-East and South-West railroad were passed to, and merged in, the Alabama and Chattanooga Railroad Company.—Sess. Acts 1868, pages 207 and 345. The lessors of the plaintiffs in this suit have shown that the line of their railroad was definitely fixed before March, 1859; that the lands sued for are designated by an odd number, and are within six miles of the line of their railroad. They have clearly shown a right to recover, if the defendant has not shown a better title.

For the defendant it is contended, *first*, that he acquired a good title by entry and purchase from the Government of the United States. He proves such entry and purchase by one Allen, from whom he is a derivative purchaser; the purchase made March 1st, 1859, possession taken immediately, and held ever since that time in independent right. He shows title from Allen down to himself. Did he acquire any title by his entry and purchase, made after the line of the railroad was definitely fixed? Had the Government of the United States any authority to sell, or title to convey?

In *Schulenberg v. Harriman*, 21 Wall. 44–60, the court said: "That the act of Congress of June 3d, 1856, passed a present interest in the lands designated, there can be no doubt. The language used imports a present grant, and admits of no other meaning. The language of the first section is, '*that there be, and is hereby, granted* to the State of Wisconsin' [Alabama] the lands specified. The third section declares, 'that the said lands *hereby granted* to said State shall be subject to *the disposal* of the legislature thereof;' and the fourth section provides in what manner sales shall be made, and enacts that, if the road be not completed in ten years, 'no further sales shall be made, and the lands unsold shall *revert* to the United States.' The power of disposal, and the provision for the lands reverting, both imply what the first section in terms declares, that a *grant* is made; that the title is transferred to the State. It is true that the route of the railroad, for the construction of which the grant was made, was yet to be designated; and until such designation, the title did not attach to any specific tracts of land. The title passed to the sections, to be afterwards located. When the route was fixed, their location became certain, and the title, which was previously imperfect, acquired precision, and became attached to the land." To the same effect are *Rutherford v. Green*, 2 Wheat. 196; *Lessieur v. Price*, 12 How. 60; *Farnsworth v. Minn. & Pac. R. R. Co.*, 2 Otto, 49. The effect of

[Swan & Billups v. Lindsey.]

these rulings is, that just so soon as the line or route of the railroad was definitely fixed, the grant became one of specific sections, the title to which passed out of the United States, and into the State of Alabama. Not an indefeasible fee out of the United States; for the right was reserved, for condition broken, to have the lands revert to the Federal Government, upon proper steps taken to that end. Not an absolute conveyance, or grant to the State, in its own right as of fee; for the State took in trust, to devote the proceeds, or have them devoted, in aid of the construction of the specified line of railroad; "for the purposes aforesaid, and no other." Still, the title passed out of the United States, and into the State of Alabama. The Government of the United States had no authority to sell the lands in question, after the line of the railroad was definitely fixed, unless a reversion to the United States had been asserted, for a breach of the condition subsequent.

It is, in the second place, contended for the defendant, that he has a good title to the lands sued for, because he, and those under whom he claims, had held the possession of the lands independently, and in their own right, for more than ten years before this suit was brought. It is a cardinal rule, that statutes of limitation, unless so expressed, do not run against the State, or the United States. *Nullum tempus occurrit Reipublicæ.* Angell. on Lim. § 37. It is contended, however, that that rule does not apply to this case, because the State held these lands in trust for the railroad company.—*Miller v. State,* 38 Ala. 600. Now, as a rule, the statute of limitations does not begin to run until there is some one entitled to sue.—2 Brick. Dig. 220, § 35. When did the North-East and South-West Ala. Railroad Company, or its successor, the Alabama and Chattanooga Railroad company, acquire the right to sue for these lands? Until it acquired the title, or a right to the possession, it could maintain no action, legal or equitable, for their recovery. The act of Congress of June 3d, 1856, and the reviving act of April 10th, 1869, did not confer the right to possess and sell all the lands granted, as soon as the line of the railroad was definitely fixed. One hundred and twenty sections, included within a continuous length of twenty miles, might be sold without performance of any condition precedent. Beyond this, the State itself could not go; and it neither did, nor could, confer on the railroad power it did not itself possess. The act of Congress constituted the State the administrator of its bounty, but hedged it around with limitations it could not transcend. The State speaks by its legislature, and, within the limits prescribed by Congress, may exercise a large discretion in the matter of disposing of the lands granted. It might have reserved to itself the power to dispose of the lands, applying the proceeds in aid of the con-

struction of the railroad; or, it might, as it did in this case, confer on the railroad corporation the power to dispose of the lands. It guarded against abuse of the power, however, by requiring that "so much of the lands, interest, rights and privileges," as were conferred by Congress to aid in the construction of the North-East and South-West railroad, should be "used and applied by said company *upon the terms, conditions and restrictions, in said act of Congress contained.*" The terms of the act of Congress were, "That a quantity of land not exceeding one hundred and twenty sections, * * included in a continuous length of twenty miles, * * may be sold; and when the Governor of said State shall certify to the Secretary of the Interior that any twenty continuous miles of * * said road is completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for * * said road, having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles, * * may be sold; and so on, from time to time, until said road is completed; and if any of said road is not completed within ten years, no further sale shall be made, and the lands unsold shall revert to the United States." The same provision is found in the reviving act of 1869, except that only three years are allowed for the completion of the road.

The following propositions may be asserted, based on these several enactments: That the right to the lands granted vested in the State from the date of the grant, subject to be devested by action taken therefor, provided the road was not completed within the time specified; in which event, the undisposed-of lands reverted to, and vested in the United States Government: That this right did not, by the mere force of the grant, attach to any defined, specified sections of land; but, when the line of the road was definitely fixed, the right attached specifically to the odd sections of the unsold public domain, lying within six miles on either side of the fixed line of the railroad: That the State was charged with the administration of this fund, and the execution of this trust, limited in its exercise by the restrictions, and, in its application, to the purposes, expressed in the acts of Congress: That the State was clothed with the absolute power to sell one hundred and twenty sections, within a continuous length of twenty miles of the railroad,—this, to aid in the construction of twenty continous miles of the railroad; but could make no further sale, until the Governor of the State certified to the Secretary of the Interior that twenty continuous miles of said road was completed: That when the Governor so certified, then the act of Congress gave the State power to sell another one hundred and twenty sections of the land granted, included within twenty continuous miles; and so on, until the

road was completed: That if the road was completed within the time prescribed, then the the indefeasible ownership in the lands undisposed of vested in the State, or its appointee; and if not so completed, then the unsold lands, no matter in what section of twenty continuous miles located, reverted to the United States: That sales and conveyances of lands made in the first hundred and twenty sections, included in a length of twenty continuous miles, or those in any subsequent length of twenty continuous miles, sold pursuant to the certificate of the Governor to the Secretary of the Interior, that a length of twenty continuous miles of the road had been completed, would vest in the purchaser all the title of Federal and State Governments, whether the railroad was ever completed or not.

The joint resolutions of the Alabama legislature, approved January 30th, 1858 (Pamph. Acts, 430), are very general in their terms. Speaking of the lands we are considering, their language is, they "are hereby disposed of, granted to, and conferred upon the North-East and South-West Alabama Railroad Company." These are strong words of grant and disposition, and, ordinarily, would convey all the title of the grantor. But, it must not be forgotten that the State held these lands in trust for a specified, public purpose. Congress confided the administration of this trust to the State, and clothed the State with the title to the lands. It imposed restrictions in the performance of this trust, which the State itself must observe and keep, and could not delegate to another any power to disregard them. Beyond the first hundred and twenty sections, as we have said, the State itself had no authority to sell the lands, except in sections of twenty miles, as the work progressed. It could not part with the limited title it held, even to the railroad, beyond the first twenty miles. If could not part with the trust Congress had clothed it with. The joint resolutions could and did empower the railroad company to dispose of the first hundred and twenty sections, of which the State had unrestricted power of disposition; and, after the first twenty consecutive miles of the railroad were completed, and so certified by the Governor to the Secretary of the Interior, they authorized the railroad to sell another hundred and twenty sections, included within another length of twenty continuous miles. And if the railroad was fully completed within the time prescribed, and there remained any portion of the granted lands undisposed of, the joint resolutions would and did vest the title to such undisposed of lands in the railroad company. This, because the State would then have fully discharged and performed the trust confided to it, and there would remain in it nothing but a property interest.

In *Farnsworth v. Minn. & Pacific R. R. Co.*, 92 U. S.

[Gayle's Adm'r v. Marshall.]

49–65, the Supreme Court, speaking of a grant like the present, said: "The act of Congress, granting lands to the Territory of Minnesota, imposed conditions upon their alienation, except as to the first one hundred and twenty sections, which the Territory could not disregard. It declared, that the lands should be exclusively applied to the construction of the road in aid of which they were granted, and to no other purpose whatever, and should be disposed of only as the work progressed. It provided that their sale should be made in parcels, as specified portions of the road were completed, and only in that manner. The evident intention of Congress was, to secure the proceeds of the lands for the work designed, and to prevent any alienation in advance of the construction of the road, with the exception of the first one hundred and twenty sections. The act made the construction of portions of the road a condition precedent to a conveyance of any other parcel by the State. No conveyance, in disregard of this condition, could pass any title to the company."

This case is not governed by the principles which controlled in *A. & F. R. R. Co. v. Burkett*, 46 Ala. 569.

From the foregoing principles it is manifest, that the legal title to the lands in controversy remained in the State of Alabama, until the railroad was completed. Till then, the State alone could maintain suit for the possession. The right of the lessors of the plaintiffs to bring this action did not accrue until the completion of the railroad. That was less than ten years before this action was brought; and inasmuch as time runneth not against the State, the ten years statute of limitations is no defense to this action.

Reversed and remanded.

SOMERVILLE, J., not sitting.