# CASES DECIDED

# MARCH TERM, 1890.

THE MACON AND BIRMINGHAM RAILROAD COMPANY *et al.*
*v.* GIBSON *et al.*

1. A railroad corporation, having power by its charter granted in 1888 to locate and construct its road where it may think proper, may, by amendment to its charter made after the company has located but before it has constructed its road, be confined to a particular route on certain prescribed conditions as to a portion of the line through a given county. This results from the reserved power of the State, declared in §§1651, 1682 of the code, to withdraw the franchises or change, modify or destroy the corporation at the will of its creator.

2. The right of the State so to amend the charter is not in any degree abridged or affected by executory contracts between the company and a construction company, and between the latter and subcontractors, touching the construction and equipment of the road. In so far as the amendment may render the performance of these contracts impossible, the impossibility will result from act of law, and performance to that extent will be excused. All parties contracting with a corporation must take notice of the conditions on which it holds its franchises and of its subjection to the legislative will.

3. Any allowable modification of the charter of a private corporation may be made by an amendment adding a proviso to one of its sections. The form of the amending act has no influence on its construction or effect.

4. A substantial, not a literal, conformity of a law to its title is required by the constitution. The title indicating that a railroad is to run into and through a named town, and the body of the act providing for running it into and through the corporate limits, or within one mile of the court-house, on certain conditions, the title covers the matter of the enactment.

5. The amending act under construction does not contemplate that the town of Thomaston shall or may devote municipal funds to the purpose specified, but that the town as a community, or the citizens, may, if they think proper, contribute voluntarily from

v 85-1

their private means and thereby raise a duty on the part of the railroad company to comply with the act.

6. The citizens of Thomaston have, as a class, a special and particular interest in the matter involved in this cause, and can support an action for the protection of that interest.

7. The class being composed of numerous individuals, some may sue in behalf of all, the interest involved being common to the whole class.

8. Nothing appears to show that the judge erred in entertaining jurisdiction of the cause. Any objection founded on the non-residence of the principal defendants, in the county, could be waived and was waived if these defendants answered without raising and urging that objection.

9. There was no need for enjoining the *mandamus* proceedings, and the injunction granted was, to that extent, improper. Direction is given to modify the injunction accordingly.

10. Under the special circumstances, as a condition of continuing the interlocutory injunction in force after the amount of money necessary to be deposited in bank by the citizens is ascertained, there ought to be bond and security required that the deposit be made at the proper time. Direction is given that it be so ordered, and that for any failure to comply with the order, the injunction be dissolved.

April 14, 1890.

Injunction. Railroads. Corporations. Statutes. Constitutional law. Contracts. Municipal corporations. Actions. Parties. Jurisdiction. Waiver. Practice. Before Judge BOYNTON. Upson county. At chambers, February 1, 1890.

On January 9, 1890, John Gibson and J. S. Stamps, citizens of Thomaston, on behalf of themselves and the citizens of that town, brought their petition for injunction against the Macon and Birmingham Railroad Company, the Macon Construction Company, Julius C. Williams and E. L. McGee, alleging as follows: In 1889, the railroad company began the construction of its road under its charter. (For the charter and its amendment see the opinion.) Its officers and those of the construction company held out to the people of Thomaston, that the road would be located through that town, and two lines were surveyed through the corporate limits in

September, 1889, and officers of one company or the other notified the citizens that the road would not be located through or near the town. In November, the mayor of Thomaston notified the railroad company that he was ready to perform the duties required of him by the amendment to the charter. In December, he notified it that he had selected a disinterested competent civil engineer to survey, in conjunction with such civil engineer as the company might select, and to examine and estimate the cost of the two routes; that is, the route around and within five miles of Thomaston proposed by the company, and the route required to be adopted by the act of the legislature; but the company refused and still refuses to appoint an engineer for the purpose, and stated that the act would not be regarded at all. The engineer appointed by the mayor has surveyed a route from a point on the located road five miles from Thomaston and in one mile of the courthouse, as required by the act, which is between a quarter and a half of a mile longer than the route proposed by the company. On it only one bridge is to be built, while on the latter four bridges are to be built, which will make it more expensive than the former route. The railroad is located along Potato creek, where it will be subject to overflow in high freshets; and should the track be built above high-water-mark, its construction will cost several thousand dollars more per mile than will the route provided for by the legislative act. The route proposed by the railroad is not suitable for the erection of a good and safe road; but a perfectly safe and cheaper one can be located on the route by Thomaston. Petitioners and the other citizens are ready to comply with their part of the requirements of the statute by paying whatever difference there may be in the cost of the two routes, and to comply with the statute in every particular. The construction company

contracted to build the railroad, with authority to locate it. Petitioners are informed and believe that this company has bought nearly 2,000 acres of land in a body, lying one and a half to four miles from Thomaston, the titles having been taken in the names of W. W. Collins and Geo. W. Jewett, who are interested in that company, and paid for by checks on W. B. Sparks, its president; also that the officers of the railroad company are interested in the construction company; also that certain persons, who are stated by others connected with the railroad company to be associated as a manufacturing company and to claim said lands or a portion of them, are persons who compose the railroad and construction companies, or that the officers of those companies are stockholders in the manufacturing company, and are interested in said lands. The scheme of the construction company is to build a town thereon, and go around Thomaston only to make their private property more valuable at the loss of the citizens of that town, which has fifteen hundred inhabitants, receives eight to ten thousand bales of cotton and sells goods to the amount of three hundred thousand dollars yearly, and whose taxable property is worth $500,000. There is no town or public to serve at the place where it is proposed to build. If the location of the road on the line proposed by the companies, and on which work is being done, be permitted, it will come not nearer than two and a half miles to Thomaston, with no depot nearer thereto than the proposed town; the scheme of the companies being to further their private interest alone, and not to subserve that of the public. The railroad company is proceeding to condemn a right of way through lands of petitioners within the five miles of Thomaston referred to in the act of the legislature, not on the line provided for by that act, but on the line being built around the town, and to and through the

land above referred to. It has no right to condemn
lands at any point within said five miles, except upon a
line which will go through Thomaston or within one
mile of the court-house. It has no authority to condemn
petitioners' lands, and is seeking to do so without war-
rant. Stamps gave it the right of way across his land
on the route to Thomaston, but refused to give it upon
another route on which it has no authority to build.
On December 20, it filed with the ordinary a written
request that some fit person be appointed as assessor
for Stamps and Gibson in ascertaining the value of the
right of way through and the damage to their lands;
stating that it had failed to agree with them as to the
same, and that they had refused to select an assessor to
act with E. L. McGee, who had been selected as such
by the company. This petition does not describe any
particular lands, nor specify any quantity of land sought
to be taken; and is defective in other respects. The
ordinary, after hearing evidence and the response of
Stamps and Gibson, ordered that the request be refused,
the company failing to show that it was its right to
have said assessors appointed. One week afterwards,
it presented to Judge HINES, of the Middle circuit, its
petition for a *mandamus* requiring the ordinary to com-
ply with the above stated request, upon which petition
the judge ordered that the ordinary show cause on the
next January 6 why the writ should not issue. The
hearing has since been set for January 13. The present
petitioners are not parties to that application, nor can
they be heard or make any objections thereto, nor can
their objections be made by the ordinary, who is claimed
by the railroad company to be a ministerial officer, com-
pelled to appoint the assessor applied for. The prayer
is, for injunction to prevent the taking of steps to con-
demn or construct the railroad on petitioners' lands,
except it be done as provided by the statute in question,

the building of the road on the route proposed by the companies or on any other route except as provided by the statute, the prosecution of the petition for *mandamus* or the appointment by the ordinary of an assessor for, petitioners, and the entering by McGee on their lands to value the same for condemnation by the company; as well as for process, etc. Discovery is waived. By amendment, the plaintiffs alleged that said defendants have located their road on the lands of petitioners against their consent, entered on Gibson's lands, cut his timbers, cleared what they call a right of way, and are proceeding to grade their line thus laid out without his consent, and will do so unless enjoined; that they are proceeding to build their line on the west side and within five miles of Thomaston, and on a line which will locate the road outside of the limits prescribed by the act of November 7, 1889, and in open disregard thereof; and that if it be so constructed, Thomaston will be greatly damaged if not destroyed commercially, which will depreciate the value of petitioners' land sought to be taken, as well as the real estate in Thomaston, and the damage will be irreparable and the amount of loss cannot possibly be estimated. Petitioners pray that defendants be enjoined from further cutting timber or grading on petitioners' lands.

The railroad and construction companies answered: The main and leading purpose of the grant and acceptance of the charter was, to establish direct railroad communication between Macon and Birmingham. In order successfully to carry out and maintain the enterprise, it is necessary, in selecting a route, that economy in laying out, building, keeping up and operating the line should be considered, in order to compete with existing lines by less direct routes between the terminal points named. On April 2, 1889, the railroad company entered into a contract with the construction

company for the construction and equipment of the entire line of road. This contract does not authorize the construction company to locate the road, but re- quires it, to cover the route adopted by the railroad company. Afterwards the railroad company caused various lines to be run, to ascertain the most direct and practicable route. Lines were examined near and through Thomaston with a view to adopting one of them should it appear to be the most direct and practi- cable ; but an examination and comparison of such line with the one finally adopted showed that no line could be run through Thomaston in any degree approxi- mating, either in direction or practicability, the one adopted. Whatever may have been said by officers of either company referring to the road's going through Thomaston, was entirely conditioned upon a suitable line being found, and not upon any consideration paid or given by any of the citizens of that town. No action was ever taken by either it or them whereby any legal or equitable rights were acquired as against either company. The line finally adopted, upon which the road is located, and along which a right of way is sought, was adopted and the location made prior to October 21, 1889, on which day a contract was entered into by the construction company and J. S. McTighe & Co. for the clearing, grubbing, excavation, embank- ment, and loose and solid rock of the road from its junction with the Ga. Southern & Fla. to its junction with the Ga. Midland & Gulf road, a distance of sixty- five miles, including the work through Upson county on the line adopted and located. This contract stipu-. lates that time shall be of its essence, and that the work therein contracted for shall be finished within six months. Work was commenced thereunder on Novem- ber 15, McTighe & Co. having sublet the work with sections of five miles covering the whole line. The

construction company is interested in the Rogers prop-
erty, which probably is that referred to in the petition;
but it does not lie on the line of the railroad, the
nearest distance between them being a mile; and no
manufacturing corporation has been organized in con-
nection with it. The construction company may at
some time seek to develop and improve it; but no
scheme has been entertained with an object to injure
Thomaston, which is already the terminus of a railroad
leading to Barnesville and crossed by respondent's line;
and this is not being built in such manner as to sub-
serve any selfish interests but to subserve in the
highest degree the public interest, if by the public is
meant the whole of the people of the State in the sec-
tions traversed by the road and not the people of
Thomaston alone. The railroad company has refused
to accept the statute in question as an amendment to
its charter and does not consider itself bound thereby,
but says that the act is unconstitutional and of no
effect. Its title is inconsistent with its body, the for-
mer requiring the railroad "to run into and through
the town of Thomaston," while the latter provides for
its going into and through the town or within one mile
thereof, with many other things not referred to in the
title. In the application sought to be made of it, it is
in violation of paragraphs 2 and 3 of section 3 of ar-
ticle 1 of the constitution, being retroactive in its effect,
impairing the obligation of the contracts already referred
to, and seeking to revoke grants of special privi-
leges to the railroad company in such manner as to
work injustice to both the corporators and the parties
with whom they have contracted. It attempts to ab-
rogate and set aside the contracts made prior to its pas-
sage between defendant and the construction company
and McTighe & Co. It seeks to compel a contract be-
tween the railroad company and the citizens or the town

of Thomaston, the citizens having no capacity to contract or be contracted with, and the town being prohibited by the constitution from making any contract with the company involving the expenditure of money. It seeks to compel the expenditure by the railroad company of large sums of money not required by its charter nor demanded by the public interest, for which the company could receive no consideration and from which no one could receive any benefit, except citizens of Thomaston or persons owning lands through which the road would run. It does not require the town or the citizens of Thomaston to put themselves in a position to comply with its terms, until the road is built from Macon to " the five mile limit," thus imposing on the company an obligation to build the road in a continuous line from Macon to such limit; whereas the contracts made contemplate, and compliance therewith will require, that the work proceed upon all parts of the line at the same time, in order to have the same completed within the time required thereby. It makes the standard of comparative cost with the line sought to be forced on the company, a line through the Rogers property, which was not the line adopted and located by it prior to November 7, 1889, nor within one mile thereof. It is not true that a road could be built upon the line located by the engineer appointed by the mayor, of Thomaston, at a lower cost than the one located by the company, nor is such line safer or more suitable; the exact contrary is true in every particular. The actual cost of the proposed line over that located by the company will be, at the rate it has contracted for work, between twenty-seven and twenty-eight thousand dollars. The line adopted will require no bridge but only four trestles. In addition to the actual first cost, a fair compensation to defendants for the extra work of the proposed line and the extra continuous cost of

keeping it up, could not be less than $15,000. It is not true that the town or its citizens are ready to comply with the terms of the act, to the extent of paying such additional cost and compensation. Respondent is informed that if any amount at all has been raised or pledged for this purpose, it is very small and utterly inadequate therefor. No guaranty has ever been given or offered the company that the town or its citizens would comply with the act. The company is and has ever been ready to pay petitioners the value of their land and any damages thereto, whenever the same could be legally ascertained. It sought to acquire the right of way through them by purchase, and when unable to do so, by condemnation; and upon petitioners' refusal to appoint an assessor, the application was made to the ordinary, who is a ministerial officer not authorized to pass judicially upon the question of such appointment. He, however, assumed to do so, heard objection to the application and evidence and argument thereon, and entered up judgment.

At the hearing, testimony tending to support the allegations of the petition and answers was introduced. The judge enjoined the defendants as prayed for, with the modification that if they "shall in good faith proceed to ascertain the difference in the costs of the line which defendants desire, and the one by or through Thomaston as specified and in the manner prescribed in the act approved November 7, 1889, as exhibited to the petition, and the town authorities or citizens of Thomaston fail or refuse to co-operate with defendants as prescribed in said act, then defendants may at once move to dissolve or modify this injunction; and if after the difference between the two lines shall be decided or ascertained as directed in said act, the town authorities or citizens of Thomaston fail or refuse to comply with said act by depositing the amount of dif-

ference, if any, then defendants may apply to have injunction modified or dissolved." To this order the defendants excepted. They also say the court erred in holding that the superior court of Upson county had jurisdiction; that plaintiffs had any cause of action as citizens of Thomaston, or any right to sue on behalf of the other citizens; and that the act in question is constitutional and does not contain matter different from what is expressed in its title, and is not retroactive in its effect upon the rights of defendants, and does not impair the obligation of the contracts between the railroad and construction companies and between the latter company and McTighe & Co., and does not revoke special privileges and immunities granted to the railroad company in such a manner as to work injustice to its creditors and corporators.

Gustin, Guerry & Hall, T. B. Cabaniss and N. J. Hammond, for plaintiffs in error.

Lanier & Anderson, Hall & Hammond, J. A. Cotten, J. Y. Allen and M. H. Sandwich, contra.

Bleckley, Chief Justice.

The Macon and Birmingham Railroad Company was incorporated by an act of the General Assembly passed in December, 1888. Acts of 1888, p. 164. The act provided, amongst other things, " that said company shall have power and authority to survey, lay out and construct, maintain and equip a railroad from the city of Macon, in the county of Bibb, or from some point on the present line of the Georgia, Southern and Florida railroad, through the county of Bibb and through the following counties or such of them as said railroad company may deem fit, to wit, Houston, Crawford, Monroe, Upson, Pike, Meriwether, Troup and Heard, to some point on the State line of Alabama, by the most direct and practicable route, to be judged of by

them, and in the direction of the city of Birmingham, Alabama." Part of the statute law of this State in force when this act of incorporation was passed were two sections (1651, 1682) of the code, as follows : "Persons are either natural or artificial. The latter are the creatures of the law, and except so far as the law forbids it, subject to be changed, modified or destroyed, at the will of their creator ; they are called corporations." "In all cases of private charters hereafter granted, the State reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter." There is no such negative in the charter of this company. These provisions of the code have been construed by the Supreme Court of the United States in Railroad Company *v.* Georgia, 98 U. S. 359. That court, adjudicating upon a charter granted in 1863, said : "These provisions of the code became, in substance, a part of the charter. Railroad Company *v.* Maine, 96 U. S. 499. It is quite too narrow a definition of the word 'franchise,' used in this statute, to hold it as meaning only the right to be a corporation. The word is generic, covering all the rights granted by the legislature. As the greater power includes every less power which is a part of it, the right to withdraw a franchise must authorize a withdrawal of every or any right or privilege which is a part of the franchise. So it was held in *The Central Railroad & Banking Co.* v. *Georgia,* 54 *Ga.* 401, and so it must be held now, especially in view of the statutory provision of the code, that private corporations are subject to be changed, modified or destroyed at the will of their creator." The constitution of 1877 declares that no law making irrevocable grants of special privileges or immunities shall be passed ; and that no grant of special privileges or immunities shall be revoked except in such manner as to work no injustice to the corporators or creditors of

the corporation. Code, §§5025, 5026. The company proceeded under its charter to locate its line of railroad through Upson county, but before it constructed any part of the same in that county, the General Assembly amended the charter by an act approved November 7th, 1889. Acts of 1889, p. 336. This amendment provided that, if the railroad runs through Upson county, and within five miles of the town of Thomaston, it shall run into and through the corporate limits of that town, or within one mile of the court-house, provided it shall not cost the company any more from where the road crosses the five mile limit on the east of the town to the "Rogers property" than any other route within that limit; the cost is to be determined by two competent disinterested civil engineers, one to be selected by the company, and the other by the mayor of Thomaston, to locate the route proposed by the company within the five mile limit, and the route within the town or within one mile of the court-house, on a way which is equitable and just both to the company and the town; these engineers are to estimate the cost of building such line, and if they fail to agree, they are to appoint a third disinterested competent civil engineer who shall decide and determine the matter; in estimating the cost of the respective routes, the safety and permanency of the road-beds, and keeping up the same, are to be considered; whatever amount the estimate shows it will cost more to go through the corporate limits, or within one mile of the court-house, than the route proposed by the company within the five mile limit, shall be paid by the town of Thomaston, or the citizens thereof; upon refusal to pay the same, the company is released from building the road through the corporate limits, or within one mile of the court-house; a sum equal to such extra cost, if any, is to be paid into some solvent national bank of this State when the road

is built from the city of Macon to the five mile limit, subject to be checked out by the company when the road is built through the five mile limit. The company refuses to accept this amendment or to comply with its terms. The citizens of Thomaston, or some of them, offer to comply on their part, and insist upon compliance by the company. This difference gives rise to the present controversy.

1. The first question is, whether the State, through the legislature, could engraft this amendment upon the charter without the consent of the company, inasmuch as the original charter granted power and authority to construct and maintain a railroad through the county of Upson by the most direct and practical route, to be judged of by the company, with no condition whatever. The amendment certainly withdraws a portion of this broad franchise on certain conditions. As modified by the amendment, the charter still allows the company to select its own route at will through the county, if in so doing it should not bring the road within five miles of Thomaston. By bearing away from that town so as not to approach within the five mile limit, the company can render this amendment wholly inapplicable to its operations. This being done, the charter will be the same with the amendment as without it. Only by approaching as near to Thomaston as five miles in locating and constructing its line, will any affirmative duty whatever devolve upon the company by virtue of the amendment. If such an alteration as this in the charter of a corporation cannot be made, it is difficult to imagine any material alteration that could be made; and of course, if the reserved power of changing, modifying and destroying will not embrace material alterations, the reservation is useless and worthless. No part of the company's line in Upson county being yet constructed, none of the company's

property is taken or destroyed by the amendment. A portion of the franchise to locate the line at will is withdrawn, and the amendment takes away nothing else; it simply resumes what the State could have withheld in granting the charter if the legislature had been so disposed. For this reason, if not for others, such cases as Detroit v. Detroit Company, 43 Mich. 140, are without application to the question before us. The authorities more directly in point are such as Tomlinson v. Jessup, 15 Wall. 454; Miller v. State, Id. 478; and Railroad v. Georgia, supra. Where an attempt is made to deprive a corporation of its property by amending its charter, doubtless the observations of Cooley, J., in Detroit v. Detroit Company, 43 Mich. supra, ought to be recognized as sound. He says: "But for the provision in the constitution of the United States which forbids impairing the obligation of contracts, the power to amend and repeal corporate charters would be ample without being expressly reserved. The reservation of the right leaves the State where any sovereignty would be if unrestained by express constitutional limitations, and with the powers which it would then possess. It might therefore do what it would be admissible for any constitutional government to do when not thus restrained, but it could not do what would be inconsistent with constitutional principles. And it cannot be necessary at this day to enter upon a discussion in denial of the right of the government to take from either individuals or corporations any property which they may have rightfully acquired. In the most arbitrary times such an act was recognized as pure tyranny, and it has been forbidden in England ever since Magna Charta, and in this country always. It is immaterial in what way the property was lawfully acquired; whether by labor in the ordinary avocations of life, by gift or descent, or by making profitable use of a franchise

granted by the State; it is enough that it has become private property, and is then protected by the 'law of the land.'" No constitutional principles are infringed by exercising a reserved power to revoke special privileges or immunities, unless the provision of our own constitution is violated which forbids doing it in such manner as to work injustice to the corporators or creditors of the corporation. Whether the mode adopted by the legislature in a given instance is just in this respect or not, whilst primarily a legislative question, may, if palpably decided wrong, become a judicial question. But there is not the slightest indication of injustice in the amendment which we are considering. We see not why the legislature, had it thought proper, could not have passed such an amendment, and made it a part of the charter, by simply enacting that if the company brought its road within five miles of Thomaston, it should locate and construct its line through the town, wholly irrespective of the comparative cost of two or more routes. To require this to be done on the further condition that any increased cost should be provided for and paid by others, was giving the company a gratuitous, rather than a necessary, measure of justice. But for the voluntary grant from the legislature, the company would have no right to construct and use over the lands of the citizens of Upson any railroad whatever; and permission to do so, attended with an express reservation of a right to revoke or modify the permission, was no pledge to the company that it might build its road where it pleased, notwithstanding the legislature might please to order otherwise. The charter was as much qualified by the terms of the code above quoted as if these sections of the code had been incorporated in the charter itself. For the corporation to complain that the legislature did what it reserved the right to do, and did it before any portion of the line had been con-

structed in Upson county, seems to us wholly without reason. The company should have been prepared at the beginning, and kept itself prepared, for such a mild and moderate exercise. of the State's reserved power.

2. Nor is the right of the State so to amend or modify the charter abridged or in any manner affected by executory contracts entered into by the company with third persons before the amending act was passed. The Macon Construction Company, in dealing with the railroad company, was bound to take notice of the general law of the State, under which the right and power were reserved which have been exercised. A tenant at will cannot make contracts with reference to the; estate which will limit the power of the landlord to, terminate the estate by means compatible with its legal; nature. So a corporation in the possession of franchises held at the will of the State cannot hinder the resumption or modification of those franchises by entering into executory contracts with third persons. Nor can that effect be wrought by like contracts between the parties immediately contracting with the corporation and subcontractors under them. On no contract whatsoever does the amendment now in question have any direct effect. Its only effect upon contracts is incidental, and if they cannot be performed consistently with the alteration in the charter made by the amending statute, their performance, in so far as thus hindered or obstructed, will be excused, the rule of law being that performance of contracts when rendered impossible by act of law stands excused. Bishop on Contracts, 594, Jones v. Judd, 4 Comst. 411 ; Heine v. Meyer, 61 N. Y. 171 ; Cordes v. Miller, 39 Mich. 581 ; Knoxville v. Bird, 12 Lea, 121 ; R. R. Co. v. Green, 9 Heisk. 588 ; Odlin v. Ins. Co., 2 Wash. C. C. 312 ; Gray v. Sims, 3 Ib. 276 ; Presbyterian Church v. New York, 5 Cow. 538 ; Baylies v. Fettyplace, 7 Mass. 325 ; Mel-

ville *v.* DeWolf, 4 E. & B. 844; Reid *v.* Hoskins, *Ib.* 979; Touteng *v.* Hubbard, 3 B. & P. 291; Baily *v.* DeCrespigny, L. R. 4 Q. B. 180; Newby *v.* Sharpe, L. R. 8 Chan. Div. 39; Coke Lit. 206a; Com. Dig. Condition, D(1), D(7), L(13); Abbot on Shipping, 596. Under these authorities, if the Macon Construction Company, or a subcontractor under it, was under a stipulation to complete the railway by a given time, and if time was of the essence of the contract, a valid excuse for failing so to do would be furnished by this subsequent legislation, if that legislation has rendered or should render it impossible to complete the work by the stipulated time. In so far as this or any other executory contract has been rendered less valuable or profitable to the parties concerned by the legislation in question, that is a consequence which should have been foreseen as possible and which must be accepted by the parties as an incident of the exercise by the legislature of its rightful legislative power. Surely it cannot rationally be contended that because the alteration of charters with respect to the latitude of the franchises granted may or does operate unfavorably upon executory contracts made by or under the corporations, the charters must remain unaltered in this respect and the reserved power in the legislature be reduced to a power in name only.

3. All the provisions introduced by the amending act into the original charter are added to the first section of the charter in the form of a proviso to the same, the initial words of the new matter being, "*Provided further.*" It is contended that because the original charter grants to the corporation the right to locate and construct the road where the company pleases, and this amendment by way of proviso limits or qualifies that right as to a portion of the line, the proviso is repugnant to the purview of the charter and is there-

fore void. Also, that as the whole amendment comes in under the form of a proviso, the whole amendment is void. It is clear, however, that there is no such repugnance in the proviso to the main purpose of the charter as that the two cannot stand together. The amendment operates by way of limitation or restriction upon some of the general terms of the charter, and that such is a proper function of a proviso is laid down by the authorities. Minis v. U. S, 15 Pet. 423; Potter's Dwarris on Statutes, 118; Sedgwick's Stat. and Con. Law, 49; Endlich on Statutes, §§184, 185; Savings Institution v. Makin, 23 Me. 360. For extreme cases in which provisos have been upheld in the charters of corporations, see Dugan v. Bridge Co., 27 Pa. St. 303; Mason v. Boon Co., 3 Wal. Jr. 252. But here the charter is not rendered inconsistent and destructive of itself by the introduction of this amendment. The matter of the amendment consists of a saving or exception which might have been introduced originally into the charter in the form of a proviso or any other form, and we see no reason why an amending act passed by a subsequent legislature, or at a subsequent session of the same legislature, could not modify or repeal anything whatsoever in the act amended, and in any form the legislature might choose to adopt. All repealing acts, for instance, might take the form of provisos. Why not? The most that could be said of such repealing acts would be that they were an abuse of the pure and proper proviso, abuses of which are common occurrences in legislation. See Coode on Legislative Expressions, 50; Georgia Railroad v. Smith, 128 U. S 174. In so far as an act passed by a subsequent legislature, or at a subsequent session of the same legislature, is inconsistent with a prior act on the same subject, a repeal of the prior act is effected; and it seems to us to make no difference that the later act

may in whole or in part consist of a proviso. The rule, so far as we know, is universal that where there is an irreconcilable conflict between two statutes, the later of the two must prevail and the former give way.

4. Another charge urged against the amending act is that it is unconstitutional, for the reason that it contains matter different from what is expressed in the title. The title is in these words: "An act to amend an act entitled an act to incorporate the Macon and Birmingham Railroad Company, approved December 26, 1888, so as to require said railroad to run into and through the town of Thomaston, in the county of Upson, and for other purposes." The body of the act requires that, on the conditions mentioned, the railroad shall run into and through the corporate limits of Thomaston, "or within one mile of the court-house." The objection urged is that this alternative requirement is not expressed or indicated in the title. Doubtless the legislature thought that to locate a railroad within a mile of the court-house was, for all substantial purposes, the same as bringing it into and through the town. The corporate limits and the actual limits of the town may not be coextensive, and whether they are or not, the reasonable purpose and object of the act, as indicated in the title, might be accomplished without keeping the body of the act exactly within the letter of its title. The meaning of the constitutional requirement is that the title and the act must correspond, not literally, but substantially; and this correspondence is to be determined in view of the subject-matter to which the legislation relates. We are satisfied that the title of this amending act is reasonably sufficient to cover all the contents of the amendment. The body of the act requires that the railroad shall run into and through *the corporate* limits of the town, unless, on certain conditions, it shall be located within one mile of the court-

house, and outside of the corporate limits. The civil engineers therein provided for must locate it within those limits, or so near thereto as to be within one mile of the court-house. When the title of an act indicates that a thing is to be or may be done, it is no variance from it for the body of the act to provide that the thing shall be done, or not done, on some condition. Here, one of the conditions on which the road is to run into and through the corporate limits of Thomaston is that the engineers, in the exercise of the discretion with which they are entrusted, shall not locate it elsewhere within a mile of the court-house. For the purposes of the act, the town may be considered as extending a mile from the court-house, whether the corporate limits have that extent or not.

5. Another objection urged to the amendment is that it seeks to enable the town of Thomaston, in its corporate capacity, to apply corporate money or revenue to the construction of a railroad. We think it has no such purpose, but that where the act says that the increased cost "shall be paid by said town of Thomaston, or the citizens thereof," it means that the town is to act as a community, not as a corporation, and that "town" and "citizens" both mean the people of the town. The payment is to be voluntary, not compulsory. The corporation is not to raise the funds as public revenue, but the people are to contribute the same freely and voluntarily. If they fail to do this, the amendment is to be without any ultimate effect on the location of the road. No tax or tribute whatever is laid, or to be laid by virtue of this act, upon property or persons within the town Neither the raising nor the expenditure of public money is contemplated. Private means alone are to be used, and if from that source the requisite fund is not raised in due time, the railroad company will be at liberty to proceed as though the amending act had not been passed.

6. We come now to the question whether the citizens of Thomaston .can, by petition in the nature of a bill in equity, invoke judicial aid for the purpose of restraining the company from violating this amendment to its charter, and compelling it to co-operate with them in administering the provisions of the amendment. No doubt the general rule is that the State alone will be heard to complain of a corporation for not conforming to the terms of its charter in matters affecting the public interest; or at all events, that the attorney-general must be a party to the suit, either as plaintiff or defendant. Green's Brice's *Ultra Vires*, 595, 602. But here the immediate interest involved, and sought to be protected, is not that of the general public, but the special and peculiar interest of the town of Thomaston. The object of the legislature in preventing the construction of this railroad within five miles of the town, unless it should pass within one mile of the court-house, was to preserve that town from decline and decay in consequence of having a railroad in the vicinity, but not near enough to hinder some rival or competing town from springing up. The general public might or might not have an interest in the measure, but it is certain that the citizens of Thomaston have a vital and peculiar interest therein. The amending act contemplates that that interest shall be respected, and provides means for its protection upon the assumption that the company will conform to the terms of the act. These terms create a legal obligation on the part of the company, and it seems to us that a corresponding right in the citizens as a community to have that obligation enforced, is created by the act. The refusal of the company to perform its legal duties to the citizens of Thomaston is a wrong to them, and the wrong is of such a nature as to admit of no adequate and appropriate remedy save a proceeding

to compel a specific performance by the company of the requirements of the act. As we have already said, the company can relieve itself and remain free from any duty to the citizens of Thomaston by not constructing its road within five miles of that town, but it cannot come within five miles with its work and not comply with the act. To do so would be a violation of its charter and a special and particular injury to the citizens of the town, who are no less entitled to the provisions of the amended charter made for their special benefit, than the company is to the provisions of the original charter unrepealed, which were made for its benefit. The citizens have as much right to complain of the company for denying them their dues under the charter as the company has, or would have, to complain of any citizen for denying it the enjoyment of any of its chartered rights. It is a mistake to suppose that corporations are created alone for their own benefit, or that their privileges are more sacred than their duties. We see not why a local and special duty may-not be enforced at the instance and by the suit of the local and special body of citizens recognized in the charter as immediately interested in some of its provisions.

7. A further question is whether some of the citizens of Thomaston, suing in behalf of themselves and all their fellow-citizens of the town, will be sufficient as parties plaintiff in this proceeding, or whether all the citizens must join as such plaintiffs. The interest being common to all as a community, and the citizens being numerous (of which fact we can take judicial notice from public statistics), we think the case is provided for by a well-recognized rule which has long prevailed in equity, and that some, as representatives of the class, may sue for all. Story's Eq. Pl. §94 *et seq.*; Mitf. Eq. Pl. marg. p. 167 *et seq.*; Spence Eq. Jur. 656 ; 1 Daniell Ch. Pr. 234, 237; Pomeroy Rem. & Rem. Rights, §388

*et seq.*; Hawes on Parties, §92 ; 1 Pomeroy Eq. Jurisprudence, §§251, 255, 269, 274 ; Phillips *v.* Hudson, L. R. 2 Ch. 243 ; Comrs., etc. *v.* Glasse, L. R. 7 Ch. 456 ; Smith *v.* Swormspedt, 16 How. 302. It is true that as only two of the citizens have become parties, it is rather a small representation of the whole community ; but considering the publicity of the case and of the interest involved in it, and the fact that the suit is located in Upson county and will be tried (if tried at all) at the county town, which is the town whose citizens are interested, there can be no cause to apprehend that the two plaintiffs on the face of the petition will be disposed, or if so disposed, allowed to misrepresent the community in whose behalf they have brought this suit. No doubt it is somewhat discretionary with a court of equity as to how many representatives of a class will, or ought to be, regarded as a fair representation of the whole class in the given instance. We simply rule that this is a proper case for some of the citizens to represent all, and that the number of representatives, though the smallest that could be recognized, is not, as matter of absolute law, insufficient.

8. One of the errors assigned is that the judge erred in holding that the superior court of Upson county has jurisdiction of the case ; but it nowhere affirmatively appears, in the bill of exceptions or the transcript of the record, that any question was raised as to the jurisdiction. From the assignment of error it might be implied that some such question arose and was decided ; but we have no information, or intimation, as to the ground or grounds suggested and insisted upon as objections to the jurisdiction. In the argument here, nonresidence in the county of Upson of the two corporation defendants (that is, the railroad company and the construction company) was, we believe, the ground mentioned; but this is a ground which can be waived, and

which was waived, inasmuch as these companies appeared and answered without at the same time filing or presenting this objection to the jurisdiction. It is needless to add more on this topic.

9. With respect to the character and scope of the injunction granted, we see nothing to disapprove except that we think any interference with the *mandamus* proceeding was needless, and under the circumstances, improper. For the protection of the citizens of Thomaston it is quite sufficient that the railroad company be restrained from constructing its proposed line anywhere within five miles of the town without conforming to the amended charter. No amount of preparation by securing the right of way or otherwise, will violate the charter or harm the town; and inasmuch as the company must wait for future developments to ascertain that it cannot lawfully construct its line on the location which it has chosen, there is good reason for not interfering with its preparation to use that route if, by reason of failure on the part of the citizens of Thomaston to perform some of the conditions devolving upon them, the route already chosen should be the one ultimately adopted. It should be borne in mind that any action whatever by the citizens is optional and voluntary. The amended charter seeks to apply compulsion to the company, but none whatever to the citizens. We think the company should be left free to secure the right of way, if it should think proper to do so, along the line of its choice, irrespective of what the citizens may or may not hereafter do. The company may not choose to avail itself of this privilege whilst the general controversy remains in an unsettled state; but whether exercised or not, the privilege should be accorded, as no violation of the charter is, or will be, involved in it. The duty of the company to yield up the line of its choice and adopt another is wholly conditional upon

the will and conduct of the people of Thomaston. At least, this will be so provided the cost of the line by or through the town exceeds the cost of that around the town. It is not always that people continue in a willing mind to raise money and deposit it in bank, or, with ever so good a will, that they can command the means if the amout to be forthcoming should be very considerable. We think the injunction should be modified so as not to extend to the *mandamus* proceedings, and we direct accordingly.

10. A court of equity, or a court of law in the exercise of equitable functions, may, and should, always impose just terms as a condition to its interference by interlocutory injunction in behalf of suitors. The granting and continuing of an injunction is not matter of strict right in the parties, but of sound discretion in the judge of the court. In the exercise of such discretion, it seems highly inexpedient to hold one of the parties to the litigation absolutely bound, whilst the other party remains perfectly free. This would have the appearance of subjecting the former to the will, or even the caprice of the latter. In view of tne fact that the citizens of Thomaston may, after the cost of the two routes is estimated in the manner pointed out by the amended charter, elect ultimately not to advance and deposit the money requisite to defray the excess of cost of the town line over that of the country line, it seems to us reasonable that upon this excess (if any) being ascertained, the plaintiffs in this petition should be required, as a condition of the continuance of the injunction after that time, to give bond and security to insure a deposit of the money, according to the amended charter, as soon as the railroad shall be built to the five mile limit. This bond should be in double the amount of the excess of cost ascertained by the estimate of the engineers, and should be payable to the railroad com-

pany with a condition to deposit in bank, conformably to the amended charter, a sum equivalent to such excess; or, on failure so to do, to answer to the company for all damages which it may sustain by reason of this injunction having been granted and continued in force. We direct that the judge of the Flint circuit, or some other judge should he be disqualified, pass an order requiring such bond and security to be given; and that upon failure to comply with its terms, the injunction be dissolved.          *Judgment affirmed, with direction.*